GULF PRODUCTION COMPANY ET AL V. CONTINENTAL OIL COMPANY ET AL.

Motion No. 14268. Cause No. 6641. Decided on
Rehearing February 25, 1942.
Second Motion for Rehearing Overruled June 10, 1942.
(164 S. W., 2d Series, 488.)

184

*Brachfield & Wolfe,* of Henderson, *McKinney & Berry,* of Cooper, *Ben H. Powell,* of Austin, *Hiner & Pannill* and *Allen & Gamble,* of Fort Worth and *Wm. Pannill,* of Houston, for G. G. Turner and wife, and *F. A. Williams,* of Galveston, *A. W. Walker, Jr., R. L. Batts, Black, Graves & Stayton* and *Chas. L. Black,* all of Austin, *H. L. Stone,* of Pittsburg, Pa., *John E. Green, Jr.,* and *Claude McCaleb,* both of Houston, *Wm. L. Wise* and *Peveril O. Settle,* both of Fort Worth, and *C. L. Stone,* of Henderson, for Gulf Production Co., all plaintiffs in error.

The requirements of the law for the joinder of the wife in a deed conveying an interest in her homestead requires that she not only consent to the sale, but to all the terms and conditions thereto, including the consideration, and she acts therein sui juris, and none of the terms and conditions of her contract can be waived or altered by the husband without her consent. Stalling v. Hullum, 79 Texas 421, 15 S. W. 677; Id. 89 Texas 431, 35 S. W. 2; Lyon & Gribble v. Ozee, 66 Texas 97, 17 S. W. 405.

The provision in the lease by Turner and his wife, covering their homestead, with respect to rentals, constituted a conditional limitation on the estate granted, which could not be altered or modified by parol agreement whereby a different performance with respect to rentals for three years in advance were substituted for the rental provisions contained in the lease. Kistler v. Latham, 255 S. W. 983; Waggoner v. Sigler Oil Co., 118 Texas 509, 19 S. W. (2d) 27.

The acceptance by Turner of syndicate interest certificates from the agent of the trustee, upon an oral agreement that the lease would remain in force for three years was not such performance as to take the transaction out of the statute of frauds, and no estoppel was thereby created against Turner and his wife and neither did the subsequent transaction whereby the original lease was reacknowledged estop either of the parties nor in any way affect the title under the Pevey lease, which was executed and delivered long prior thereto. Ward v. Stewart, 62 Texas 333; Wood v. Jones, 35 Texas 65; Mondragon v. Mondragon, 113 Texas 404, 257 S. W. 215.

The Court of Civil Appeals erred in holding that Joiner, Trustee, was an innocent purchaser by virtue of his lease, which conveyed neither an equitable nor legal title, because the

evidence showed that he had actual and constructive notice of Birdwell's interest in the trustee lease. Miles v. Kelley, 40 S. W. 599; Calloway v. Bookout, 37 S. W. (2d) 243; Cage v. Perry, 142 S. W. 75; Texas Co. v. Dunlap, 41 S. W. (2d) 42; Daniels v. Mason, 90 Texas 240, 38 S. W. 161.

In a oil and gas lease contract which provides for the termination of the lease if no well is drilled or commenced on or before a certain date *unless* the lessee, on or before that date, shall pay or tender to pay to the lessor, or deposit to his credit in bank, a specific sum of money which shall operate as rental and cover the privilege of deferring the commencement of the well for six months, the said "unless clause" creates a special common law limitation defining and controlling the duration of the estate, and it was error for the court to hold that the oral transaction whereby the lessor accepted syndicate interest certificates was the same as the event described in the written instrument with the result that the estate granted by that instrument remained in full force and effect. Wright v. Donaubauer, 137 Texas 473, 154 S. W. (2d) 637; 1 Washburn Real Property (6th Ed) 180, sec. 167; 6 Williston on Contracts, Secs., 1837-1847; Hamburg v. Wood, 66 Texas 168.

*Dan Moody* and *G. B. Smedley*, both of Austin, *Walace Hawkins, Chas. B. Wallace, Ralph B. Shank, Sidney Latham, Phillips & Phillips* and *J. B. McEntire*, all of Dallas, *Phillips, Trammell, Estes, Edwards & Orn, Joe Estes, Chizum, Estes & Ludlum, Eugene Lary* and *Dillard Estes, James Ludlum, Clayton L. Orn, Lloyd E. Price, G. R. Pate, John A. Braly* and *Burney Braly*, all of Fort Worth, *McEntire, James & Clower*, of Tyler, and *W. L. Summers*, of Urbana, Ill., for defendants in error.

Granting that the lease to the trustee vested in the lessee an estate in fee upon special limitations, all that remained in the lessor at the date the rentals were satisfied was a bare possibility of reverter, which not being an estate in land is not sufficient to support a homestead right; hence no homestead right of the lessor's wife was violated by the satisfaction of the rentals in the manner found by the jury. Sawyer v. Robison, 114 Texas 437, 268 S. W. 151; Theisen v. Robison, 117 Texas 489; Caruthers v. Leonard, 254 S. W. 779; Lyford v. City of Laconia, 75 N. H. 220, 72 Atl. 1085, 22 L. R. A. (N. S.) 1062.

On the question of the effect of the "unless clause," see Summer's Oil & Gas, 511, sec. 161; Smith v. Harris, 252 S. W. 841; Stovall v. Texas Co., 262 S. W. 153.

As to the duty imposed upon a purchaser of land to enquire into the condition of the title prior to the time his grantor acquired title. Breen v. Morehead, 104 Texas 257; Miller v. Yturria, 69 Texas 549.

The following attorneys filed briefs as Amici Curiae.

*Carrigan, Hoffman & Carrigan, A. H. Britain, John E. Kilgore* and *Guy Rogers,* all of Wichita Falls, *George H. Carter,* of Marlin, *Bomberg, Leftwich, Carrington & Gowan, Charles B. Ellard, Turner, Rodgers & Winn, Geo. S. Terry, J. W. Timmins, T. L. Foster, W. H. Sanford, Conan Cantwell* and *Renfro & Kilgore,* all of Dallas, *Baker, Botts, Andrews & Wharton, Jesse J. Lee, Fred L. Williams, E. Wayne Lawler* and *McDonald Meachum,* all of Houston, *Joiner Cartwright, Will E. Orgain* and *Katherine R. Fontenberry,* all of Beaumont, *Don Emery* and *R. L. Foster,* of Bartesville, Okla., *E. H. Foster, Adkins, Pipkin, Madden & Keffer, J. B. Dooley* and *Morgan, Culton, Morgan & Britian,* all of Amarillo, *Ike D. White* and *H. Grady Chandler,* both of Austin, *John B. McNamara* and *John B. Atkinson,* both of Waco, *Allan Shivers,* of Port Arthur, *Crenshaw, Dupree & Milam,* of Lubbock, *Hughhes, Hardeman & Wilson, H. E. Jackson* and *Robt. T. Neill,* all of San Angelo, *L. J. Wardlaw, Montague & Fannin, Sidney L. Samuels* and *Mark McGee,* all of Fort Worth, *Wm. Jarrell Smith,* of Pampa, *Ballinger Mills,* of Galveston, *Klapproth & Hamilton* and *John Perkins,* both of Midland, *Dallas Ivey,* of Center, *Homer B. Latham,* of Bowie, *Henry Russell,* of Pecos and *J. G. Harrell,* of Breckenridge.

MR. JUSTICE SHARP delivered the opinion of the Court.

This case is before us on motion for rehearing. The original opinion is reported in 132 S. W. (2d) 553. After a careful consideration of the motion and the many able briefs filed by counsel for the litigants as well as by amici curiae, we have reached the conclusion to witdraw the original opinion and substitute the following:

The Continental Oil Company, the East Texas Refining Company, H. L. Hunt, and P. G. Lake filed this suit against G. G.

Turner and wife, Sina A. Turner, and the Gulf Production Company, to recover the oil and gas leasehold estate in a certain tract of 311.72 acres of land, more or less, in Rusk County, Texas. Plaintiffs claimed title under an oil and gas lease from G. G. Turner and wife to C. M. Joiner, Trustee, dated April 7, 1927. The Gulf Production Company claimed title under a lease executed by G. G. Turner and wife to J. W. Pevey, dated July 25, 1930. The case was brought in the form of an action in trespass to try title, but plaintiffs specifically pleaded the Turner lease of April 7, 1927, and compliance with its terms, as the source of their title. The case was tried before a jury, and in response to findings of the jury the trial court entered judgment in favor of the plaintiffs. The Court of Civil Appeals affirmed that judgment. 61 S. W. (2d) 185. This Court granted a writ of error.

Defendants in error claim under a lease executed April 7, 1927, by G. G. Turner and wife to C. M. Joiner, Trustee, and filed for record April 15, 1927. On October 18, 1930, the Turners reacknowledged this lease before a different notary public. Gulf Production Company claims under a lease executed by Turner and wife to J. W. Pevey, dated July 25, 1930, and filed for record August 5, 1930. Which of the two leases is superior, is the question here presented for decision.

The jury found: (1) That G. G. Turner and wife prior to April 7, 1928, accepted from Dan Cameron syndicate interest certificates purporting to cover the 80-acre Joiner Discovery Oil Well tract, in satisfaction of the rentals payable to G. G. Turner and wife on the C. M. Joiner, Trustee, lease for the three succeeding years commencing April 7, 1928; (2) that G. G. Turner and wife prior to August 2, 1930, the date of the purported J. W. Pevey lease, moved away from the land in controversy in this suit, with no intention of returning and occupying same as their homestead; (3) that the Continental Oil Company, the East Texas Refining Company, H. L. Hunt, and P. G. Lake, at the time of the purchase of the interest claimed by them in the property in controversy, did not know, and could not have known by the exercise of ordinary inquiry, of any defect in the title to the land.

G. G. Turner and wife executed to C. M. Joiner, Trustee, an oil and gas lease on 311.72 acres of land, above described. It was in the usual form, and was to run for five years, and as long thereafter as oil or gas might be produced. This lease was

acknowledged by Turner and his wife in statutory form, was dated April 7, 1927, and was filed for record. The lease involved here is an ordinary oil and gas lease, and is classed an "unless clause" lease. The "drilling clause" of the lease reads:

"If no well be commenced on said land on or before the 7 day of April 1928 this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the First State Bank at Overton, Texas, or its successors, which shall continue as the depository, regardless of changes in the ownership of said land, the sum of Seventy Seven and 25/100 Dollars, which shall operate as rental and cover the privilege of deferring the commencement of a well for Six (6) months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of month successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred."

Plaintiffs in error contend that the foregoing clause of the lease was never complied with, and that the lease terminated by its own terms on April 7, 1928, long before Pevey, through whom the Gulf Company claims, obtained his lease from Turner and wife. Defendants in error allege in their pleadings that they claim under the Joiner lease, and that the delay rentals had been fully paid.

The testimony shows that Joiner, who was drilling an oil well in the vicinity of this land, was in hard financial straits, and that he was unable to pay the delay rentals on the lease in money; and he proposed that if the lessors would accept syndicate certificates in payment of the delay rentals, he could continue to drill the well. Defendants in error contend that Turner accepted, prior to April 7, 1928, the syndicate certificates as payment of the delay rentals, and the work continued on the well; and that the acceptance of such syndicate certificates continued the original terms of the lease. On the other hand, plaintiffs in error contend that the lease executed by Turner and wife to Joiner was on the Turners' homestead, and that Turner did not have the right to accept the syndicate certificates as payment, in lieu of the cash specified in the lease.

The issue as to whether Turner and his wife accepted the syndicate certificates was raised; but that issue was decided against the Turners when the jury, in response to a special issue, answered that Turner and wife had accepted such syndicate certificates in payment of the delay rentals. Plaintiffs in error also contend that it should be held, as a matter of law, that Turner did not have the right to accept such syndicate certificates in payment of the delay rentals, and continue the lease in force, for the following reasons: (1) That it was an oral modification of the lease, and was in violation of the Statutes of Frauds and the Statute of Conveyances; (2) that such transaction violated the homstead rights of Mrs. Turner; and (3) that the provisions of the "unless" clause providing that, in the absence of drilling operations, the lease would terminate unless $77.25 was paid by a certain time, constituted a limitation on the estate; and, therefore, unless $77.25 in money was paid, the lease terminated by its own terms.

The lessors had the right to accept or reject the syndicate certificates as payment of the delay rentals. If the delay rentals were not paid on or before April 7, 1928, as provided for in the lease, the lease terminated by its own terms. Prior to that date the lessors preferred that the lease should not terminate, and accepted the syndicate certificates in lieu of the money, as payment of the delay rentals. The original lease unquestionably satisfied the Statute of Frauds and the Statute of Conveyances (Articles 3995, 1288, and 1291, Vernon's Annotated Texas Civil Statutes), and we are here dealing with the method of payment. The lease itself provides a means by which it was to be extended. Where the rent is paid and the lease is extended, the lessee does not hold under a new or different contract, but holds under the original lease.

■ The following rules are well established:

(1) That the parties to a contract, grant, or option may lawfully change the medium of payment, and waive strict performance of the method of payment, without violating the Statute of Frauds. Jones v. Gibbs (Com. App.), 133 Tex. 627, 130 S. W. (2d) 265; Hill v. Brown, 225 S. W. 780, id. 237 S. W. 252 (Com. App.); Mitchell v. Simms (Com. App.), 63 S. W. (2d) 371; Khoure Bros. v. Jonakin (Ky.), 300 S. W. 612; 16 R. C. L., p. 885, sec. 389.

(2) That a creditor and a debtor may make and accept satisfactory payment of a debt otherwise than in money. As

between a debtor and a creditor, anything may be agreed upon as satisfaction; and whatever is accepted by the creditor in satisfaction is effective as payment, and discharges the debt. Robson v. Watts' Heirs, 11 Texas 764; Hinsley v. Ryon, 9 Texas 405; Yndo v. Rivas, 107 Texas 408; 180 S. W. 96; Wright v. Donaubauer (Sup. Ct.), 154 S. W. (2d) 637; 1 Williston on Contracts (Rev. Ed., 1936), p. 423, sec. 121; Mills-Willingham, Law of Oil & Gas, p. 142.

(3) That the strict performance of a contract which is required to be in writing may be waived, or its terms extended, by oral agreement. Presidio Mining Co. v. Bullis, 68 Texas 581, 4 S. W. 860; Bullis v. Noyes,, 75 Tex. 540, 12 S. W. 397; Watkins v. Arnold (Civ. App., writ refused), 60 S. W. (2d) 476; Ley v. Patton (Civ. App., writ dismissed), 81 S. W. (2d) 1087; Dockery v. Thorne (Civ. App., writ refused), 135 S. W. 593; Lewis Bros. v. Pendleton (Civ. App., writ dismissed), 227 S. W. 502; Jones v. Gibbs, 133 Texas 627, 130 S. W. (2d) 265.

In Restatement of the Law of Contracts, Section 224, the general rule is announced as follows:

"The performance of a condition qualifying a promise in a contract within the Statute may be excused by an oral agreement or permission of the promisor that the condition need not be performed, if the agreement or permission is given while performance of the condition is possible, and in reliance on the agreement or permission, while it is unrevoked, the promisee materially changes his position."

See also State v. Tyler County State Bank (Com. App.), 277 S. W. 625; Greenwood v. Senter (Civ. App.), 44 S. W. (2d) 504.

■ The Turners had the right to accept the syndicate certificates, if they saw fit to do so. They exercised that right by accepting such certificates in payment of the delay rentals. And this occurred on or before the date stipulated for the payment of such delay rentals. The jury found that Turner and wife accepted syndicate certificates in payment of the delay rentals prior to April 7, 1928. Consequently, the precise question for determination here is: Did the acceptance of the certificates by the Turners satisfy the payment of the delay rentals and continue in force the terms of the lease? We think that

the great weight of authority supports the conclusion that it did; and we so hold.

■ The husband has the right to collect, receive, and dispose of the proceeds of the homestead, whether the proceeds arise from a lease of the homestead or from damages or insurance paid on account of destruction or injury to the homestead. This right rests on the ground that the proceeds of a sale or lease of the homestead are mere personal property, both before and after they are received by the husband. Whiteselle v. Jones (Civ. App.), 39 S. W. 405; Alvord Nat'l Bank v. Ferguson (Civ. App.), 126 S. W. 622 (writ refused); Johnson v. Hall, 163 S. W. 399; Williams v. Corpus Christi Bank & Trust Co. (Civ. App., writ refused), 104 S. W. (2d) 56.

We are not here concerned with the question as to whether a husband alone may change or extend a lease or lien on the homestead, without the joinder of his wife. Here the husband and wife joined in the creation of the lease. That lease was never changed nor extended. It simply continued in force as originally executed by them. The only question is their right to accept payment of the rentals in a form different from that provided for in the lease. The jury found that the husband and wife both joined in accepting the substitute payment. This occurred before the lease had lapsed on account of the failure to pay rentals. We think they had a right to accept payment of the rentals in the form they did, and that the lease previously executed by them continued in force without the necessity of a re-execution thereof by the husband and wife.

The jury found that G. G. Turner and wife accepted the syndicate interest certificates in satisfaction of the rentals, and we cannot hold, as a matter of law, that such transaction violated the homestead rights of Mrs. Turner.

■ The plaintiffs in error contend that the lease from Turner and wife to Joiner, Trustee, being at least in part on the homestead of Turner and wife, was to that extent void, because G. P. Birdwell, the notary before whom the acknowledgments were taken, had a beneficial interest in the right so granted by the lease, thus disqualifying him to act as notary in taking the acknowledgments. The alleged interest of Birdwell arose in this manner: On March 29, 1927, before the Turners executed their lease to Joiner, Trustee, the said Joiner conveyed to W. D. Tucker a one-fourth interest in all leases then owned

in Rusk County and a one-fourth interest in all leases thereafter to be "taken in the name of C. M. Joiner, Trustee, in Rusk County." This instrument was acknowledged before one G. P. Birdwell, but was not recorded until August 19, 1930. On March 30, 1927, also prior to the time of any conveyance from the Turners to Joiner, the said W. D. Tucker sold and conveyed one-half of his one-fourth interest in the leases owned and to be acquired by Joiner, as Trustee, to Sam Warren, in trust for several men, including one G. P. Birdwell. The instrument showed on its face that G. P. Birdwell was one of the beneficiaries therein. This instrument was acknowledged before one G. P. Birdwell and was attached to the instrument of date March 29, 1927, above described, and recorded August 19, 1930.

All of the conveyances through which G. P. Birdwell acquired an interest in the leases were executed prior to the time Joiner acquired the lease here in question, and were recorded after the Turners had executed the lease to Joiner, but before Joiner had executed the leases to the defendants in error. While the lease from Turner and wife to Joiner, Trustee, was acknowledged before one G. P. Birdwell, as were the prior conveyances of Joiner to Tucker, and of Tucker to Warren, Trustee for the benefit of one G. P. Birdwell, there is no evidence or finding by the jury that the G. P. Birdwell who took the acknowledgments of Turner and wife to the lease to Joiner, Trustee, was the same person as the G. P. Birdwell who acquired a beneficial interest in the lease through the prior conveyances from Joiner to Tucker, and from Tucker to Warren, as trustee for the benefit of Birdwell.

In this connection, it should be noted that the conveyances from Joiner to Tucker, and from Tucker to Warren, as trustee for the benefit of Birdwell, are not here presented to show an outstanding superior title in Birdwell. They are being here presented merely for the purpose of showing that Birdwell was disqualified to act as notary in taking the acknowledgments of Turner and wife to the lease to Joiner, as trustee; thereby *defeating* the title deraigned through the Joiner lease.

There is in some instances a presumption of identity of person arising from indentity of name; but this presumption is usually indulged in support of the *regularity* of land titles. It is never indulged in when its effect would be to negative the regularity and soundness of such a title. 30 Tex. Jur., p. 600, sec. 14, states the rule as follows:

"The presumption of identity of person that arises from identity of name is not one of universal application. It grew out of the general presumption in support of the integrity of records and the regularity of land titles, and it ceases to become operative whenever its effect would be to negative them."

See also Waller v. Edmonds, 47 Texas 468; Kelley v. Consolidated Underwriters (Civ. App.), 300 S. W. 981, 984; Corey v. Moore, 11 S. E. 114, 86 Va. 721; Jones on Evidence (2d ed., 1926), p. 607, sec. 355; Buckeye Refining Co. v. Kelly, 124 Pacific, 536, 163 Cal. 8, Ann. Cas. 1913E, 840; Bryan v. Kales, 31 Pacific, 517, 3 Ariz. 423 (affirmed 40 L. Ed. 1020, 162 U. S. 411, 16 S. Ct. 802); Stevenson v. Murray, 6 So. 301, 87 Ala. 422; Dorente v. Sullivan, 7 Cal. 279; Dow v. Seely, 29 Ill. 495; Liddon v. Hodnett, 22 Fla. 443 (Fla. Sup. Ct.); Prescott v. Tufts, 7 Mass. 209; Ellsworth v. Moore, 5 Ia. 486; Davis v. State, 75 So. 823; Howard v. Lock, 22 S. W. 332 (Ky. App.); and see annotation, Ann. Cas. 1917E, 121.

Since there was no proof, nor finding by the jury, nor request for such finding, that the G. P. Birdwell who took the acknowledgments of Turner and his wife to the lease to Joiner, Trustee, was the same G. P. Birdwell who had previously acquired a beneficial interest in all leases to be thereafter acquired by Joiner; and since we cannot indulge in such presumption, there is nothing to support the contention that the notary who took the acknowledgments to the lease from Turner and wife to Joiner, Trustee, was in anywise disqualified. Nor is it shown that any fraud was practiced or any undue influence was brought to bear on either Turner or his wife in taking their acknowledgments to the lease given to Joiner. Since Turner and his wife actually signed the lease and appeared before a notary public and acknowledged same, and since the lease and the notary's certificate were regular on their face, and in no way disclosed the interest of the notary therein, the instrument would be valid to subsequent purchasers without notice of the defect. Waltee v. Weaver, 57 Texas 569; Peterson & Fowler v. Lowry, 48 Texas 408; Pool v. Chase, 46 Texas 207; Sanger v. Calloway (Com. App.), 61 S. W. (2d) 988; Adkins-Polk Co. v. Rhodes (Com. App.), 24 S. W. (2d) 351; Wells v. Laird (Civ. App., writ refused), 57 S. W. (2d) 395; Southwestern Mfg. Co. v. Hughes (Civ. App., writ refused), 60 S. W. 684; Gore v. Citizens State Bank (Civ. App., writ refused), 88 S. W. 624) 721; Jones v. Equitable Bldg. & Loan Assn. (Civ. App., writ refused), 45 S. W. (2d) 438; Loden v. Carothers (Civ.

App.), 85 S. W. (2d) 291; 1 Tex. Jur., p. 596, sec. 194; 23 Tex. Jur., p. 272, sec. 236.

But even if there had been evidence that the G. P. Birdwell who took the acknowledgments of Turner and wife to the lease from them to Joiner, as trustee, was the same person as the G. P. Birdwell who acquired a beneficial interest in the lease through the prior conveyances from Joiner to Tucker, and from Tucker to Warren, as trustee for Birdwell, the result would be the same; because the defendants in error were not charged with notice thereof. The jury found that the defendants in error had no actual notice of any defect in the title to the lease, and the evidence is sufficient to support that finding. If there was any notice at all of Birdwell's disqualification to take the acknowledgments, it was the constructive notice arising from the recording of the conveyances through which Birdwell acquired his interest. It appears, however, if we were to indulge in the presumption of identity of person arising from the mere identity of name, that Birdwell acted as notary in taking the acknowledgment in the conveyance from Tucker to Warren, as trustee for Birdwell. In other words, the very instrument through which G. P. Birdwell acquired his interest in the lease showed on its face that the same G. P. Birdwell was both notary and grantee. He took the acknowledgment to the conveyance of the lease to himself. If we were to indulge in the presumption that the G. P. Birdwell who took the acknowledgment to the conveyance was the same person named as the beneficiary in the conveyance, then we would have to hold that he was disqualified to take the acknowledgment to such conveyance. The defect in the instrument under which Birdwell acquired his interest in the lease would be apparent on the face of the instrument, and such instrument would not be subject to recordation. 1 Tex. Jur., p. 424, sec. 15; 36 Tex. Jur., p. 439, sec. 31; Whitehead v. Foley, 28 Texas 268; McDaniel v. Needham, 61 Texas 269; Birdseye v. Rogers (Civ. App.), 26 S. W. 841; Christy v. Romero (Civ. App., writ refused), 140 S. W. 516; Salmon v. Huff, 80 Texas 133, 15 S. W. 257; Coffey v. Hendricks, 66 Texas 676, 2 S. W. 269; Holliday v. Cromwell, 26 Texas 188. If the instrument was not subject to recordation, subsequent purchasers were not required to take notice thereof, even though same was actually recorded in the deed records. 1 Tex. Jur., p. 424; sec. 15; 36 Tex. Jur., p. 487, sec. 57; King v. Russell, 40 Texas 125; Taylor v. Harrison, 47 Texas 454; Hayden v. Moffat, 74 Texas 647; 12 S. W. 820; Peters v. Clements, 46 Texas 114; Farmers Mut. Royalty Syndi-

cate v. Isaacks (Civ. App.), 138 S. W. (2d) 228. We therefore hold that there was no such proof of a defect in the acknowledgments in the lease from Turner and wife to Joiner as to render the same invalid.

■ Now the question presents itself whether the word "Trustee" inserted in the Joiner lease was sufficient to impose upon a purchaser under such lease the duty of inquiring and ascertaining who were the beneficiaries in such lease. There is nothing in the Joiner lease which in any manner indicated that Birdwell had an interest therein.

Prior to 1925 the rule prevailed in this State that subsequent purchasers of property which had been conveyed to a trustee were legally bound to ascertain who were the beneficiaries in the trust conveyance. This placed quite a burden upon those who acquired property from a trustee. In 1925 the Legislature changed that rule by adopting Article 7425a, Vernon's Annotated Texas Civil Statutes, which reads as follows:

"Where a trust is created, but is not contained or declared in the conveyance to the trustee, or when a conveyance or transfer is made to a trustee without disclosing the names of the beneficiary, or beneficiaries the trustee shall be held to have the power to convey or transfer or encumber the title and whenever he shall execute and deliver a conveyance or transfer or encumbrance of such property, as trustee, such conveyance or transfer or encumbrance shall not thereafter be questioned by any one claiming as a beneficiary under such · trust or by any one claiming by, through, or under an undisclosed beneficiary, provided that none of the trust property in the hands of said trustee shall be liable for personal obligations of said trustee."

Under the plain provisions of the above statute, where the conveyance was from Turner and wife to Joiner, as trustee, without disclosing for whose benefit Joiner held as trustee, the defendants in error could purchase from Joiner, as trustee, without being charged with constructive notice of Birdwell's interest, if any, in the property.

■ The fact that the original lease from Turner and wife to Joiner, as trustee, was afterwards reacknowledged before a different notary, after Pevey had taken a lease on the same property, in our judgment was not an admission that the orig-

inal lease was void; and such act would not be a waiver of any rights acquired under the lease as originally acknowledged, nor estop Joiner and his vendees from asserting such rights. At most, it might raise an issue to go to the jury; but the jury, in finding that the defendants in error had no notice of any defect in the title, resolved that issue in favor of said defendants in error.

The defendants in error further contend that, since whatever title Birdwell had in the lease emanated out of Joiner prior to the time Joiner acquired an interest therein, they, as purchasers through Joiner, were not required to take notice of the conveyances through which Birdwell acquired an interest in the lease. They cite in support of their contentions the following authorities: Breen v. Morehead, 104 Texas 254, 136 S. W. 1047, Ann. Cas. 1914A, 1285; Pomeroy's Equity Jurisprudence, vol. 2, p. 1133, sec. 658; Copelin v. Shauler (Tex. Sup.), 6 S. W. 668; Anderson v. Farmer (Civ. App., writ refused), 189 S. W. 508; 4 Tiffany, Real Property, (3d ed., 1939), p. 653, sec. 1234; Patton on Titles (1938), sec. 45, 43 Tex. Jur., p. 652, sec. 384; 36 Tex. Jur., p. 481, sec. 52. We omit a discussion of this contention, because same is not necessary to a decision of the case.

■ This case was submitted to a jury, and their findings were made as above indicated, and the trial judge entered judgment thereon. Both the trial court and the Court of Civil Appeals found that there was sufficient evidence to support the judgment. This Court will not set aside a judgment of the trial court, unless it can be said, as a matter of law, that there was no evidence of a probative nature to support such judgment. We have examined the statement of facts and the entire record, and have found evidence to support the judgment of the trial court. Therefore this Court is not justified in holding to the contrary. Merrell et ux v. Dorothy Hume Timmons et vir., 138 Texas 250, 158 S. W. (2d) 278; Beer v. Landman, 88 Texas 450, 31 S. W. 805; 11 Tex. Jur., p. 871, sec. 113.

We shall not discuss the question as to whether or not the Turners abandoned their homestead. In view of the conclusions reached herein, that question becomes immaterial.

The motion for rehearing of defendants in error is granted, and the former judgment of this Court is set aside. The judgments of the trial court and of the Court of Civil Appeals are affirmed.

MR. JUDGE SMEDLEY not sitting.

MR. JUSTICE CRITZ, dissenting.

I most respectfully dissent from the opinion of the majority in this cause. In my opinion, the opinion written by our late Chief Justice C. M. Cureton, and reported in 132 S. W. (2d) 553, this volume 202, correctly disposes of this case. No good purpose would be served by my writing further.

Opinions delivered February 25, 1942.

\*  \*  \*  \*

Further motions for rehearing were overruled on June 10, 1942, with Mr. Justice Critz filing an additional dissenting opinion, as follows:

MR. JUSTICE CRITZ, dissenting.

When judgment was entered in this case granting the motion for rehearing filed herein by the Continental Oil Company et al, I dissented from the opinion written by Associate Justice Sharp, with the statement: "In my opinion, the opinion written by our late Chief Justice C. M. Cureton, and reported in 132 S. W. (2d) 553, this volume 202, correctly disposes of this case. No good purpose would be served by my writing further." In view of the far-reaching effect of the rulings contained in the majority opinion on rehearing, I feel that I should make a statement of my views on the issues which I think should control the decision of this case.

As shown by the original opinion by Chief Justice Cureton, and the opinion of the majority of this Court on rehearing by Associate Justice Sharp, Continental Oil Company et al assert title in this cause under an oil and gas lease, dated April 7, 1927, from G. G. Turner and wife, Sina A. Turner, to C. M. Joiner covering a tract of 311.72 acres of land in Rusk County, Texas. The above lease is in the usual form of an "unless" oil and gas lease. It will be noted that it contains, among others, the following provisions:

It states that it leases the land above mentioned:

(1) "for the sole and only purpose of mining and operating for oil and gas or of laying pipe lines and building tanks, stations and structures thereon to produce, save and take care of said production."

(2) It provides that said lease "shall remain in full force for a term of five years from its date, and as long thereafter as oil or gas, or either of them, is produced from said land by lessee."

(3) It provides: "If no well be commenced on said land on or before the 7th day of April, 1928, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor or to the lessor's credit in the First State Bank at Overton, Texas, or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of Seventy-seven and 25/100 ($77.25) Dollars, which shall operate as a rental and confer the privilege of deferring the commencement of a well for six (6) months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively."

It is shown that the homestead of Turner and wife was a part of this 311.72-acre tract; that neither Joiner nor any of his assigns have ever drilled a well for oil or gas on this land, or erected any improvements thereon; that the sums of money required by the terms of this lease to be paid, to keep it in force after April 7, 1928, were never paid; that Joiner proposed to G. G. Turner that he take "syndicate interest certificates" in lieu of the payments in money for the three succeeding years commencing April 7, 1928, called for in the lease contract; that Turner agreed to this; and that such certificates were delivered to Turner; but no written memorandum of change in the lease contract was signed by Turner and wife, or either of them. Finally, it is shown that Turner and wife, accepted the above-mentioned "syndicate interest certificates" in payment of the delay rentals provided for in the lease contract.

It will be noted that the above lease contract provides that it shall remain in force for a term of five years from its date, and as long thereafter as oil or gas, or either of them, is produced in paying quantities. It is then provided that if no well be commenced on the land covered by the lease on or before April 7, 1928, the lease shall terminate as to both parties, "unless" the lessee shall pay or tender to the lessor or to the lessor's credit in a certain named bank the sum of $77.25,

which shall operate as a rental and confer the privilege of deferring the commencement of a well six months from said date. In like manner and upon like payments or tenders, the commencement of a well could be further deferred for like periods for the same number of months successively until the end of the five-year primary period.

It is settled by the decisions of this Court that the above instrument, while called a mineral or oil and gas lease, is, in law, a conveyance of an estate in land. Its effect is to sever the mineral estate from the surface estate, and convey the mineral estate to the lessee named in the contract. It is also settled by the decisions of this Court that, while an instrument of this kind is, in law, a conveyance of an estate in land, the "unless" clause operates to limit the estate conveyed. The opinion of the majority does not question, but fully recognizes the above-stated construction of this instrument, and of others of like character and import.

I think it is also settled as the law of this State that the "unless" provisions in a lease of this kind are not only limitations on the grant or estate conveyed, but that the events contained or named in such provisions mark the duration of the estate granted. The estate granted either continues to exist for its primary term, in this instance five years, or it terminates before the primary term is ended according to the happening or not happening of the event or events of the "unless" provisions made a limitation upon the grant.

Under the "unless" provisions of this and like leases the lessee is under no obligation to either drill a well or pay rentals. He simply has the option of permitting the lease or estate granted to terminate and cease to exist, or he can keep such lease or estate alive and in effect by either drilling or paying rentals, as specified in its "unless" provisions.

When duly executed, a contract such as this expresses the agreement of the parties and definitely and completely fixes, determines, and defines the very character of the estate granted, and the method by which it will endure for the primary period, or terminate at a prior date. In my opinion, since the "unless" provisions of this contract are limitations upon the very grant itself, fix the very character of the estate granted, and mark its duration, they constitute, in fact and in law, a part of the very essence of the title created in the first instance. This

being true, it is my opinion that permitting a change of such provisions to be effected in parol is to violate not only the letter, but the very object and intent of our statutes of conveyance and of frauds. Articles 1288, 1291, 3995, R. C. S. 1925.

To my mind it is just as logical to say that the times named for the drilling of a well, or the payment of delay rentals, provided by the "unless" provisions of this lease contract, can be shortened or extended in parol, as it would be to say that the thing itself, provided to be done, can be so changed to something else. In fact, it appears to me that if the thing itself provided to be done can be changed to something else by a mere parol agreement, then the thing itself can be absolutely abolished in the same way, and nothing substituted in its place. I mention these matters to show the far-reaching consequences of the opinion of the majority on the rights of both lessors and lessees.

Chief Justice Cureton's opinion fully discusses the nature and effect of the "unless" clause in this instrument. Such opinion also points out that under our statutes an estate conveyed is deemed the grant of a fee simple title if a less estate be not limited by express words, or does not appear to have been granted. No one would argue that the limitation upon the estate here granted could have rested originally in parol. If not, I think that Chief Justice Cureton's opinion fully demonstrates that such limitation cannot be altered, changed, or abolished in parol.

Finally, I think Chief Justice Cureton's opinion correctly announces the law which ought to govern this case in so far as such opinion deals with the powers to change the "unless" provisions of this written contract by subsequent parol agreement. I also thing that Chief Justice Cureton's opinion correctly announces the law governing this case in so far as it deals with the power of Turner and wife to alter or change the "unless" provisions of this lease contract as to the land covered thereby which constituted their homestead, except by written instrument duly executed by both Turner and wife, and separately acknowledged by the wife. (See this volume, page 212.)

Opinion delivered June 10, 1942.

For the convenience of the Bar, the opinion by the late Chief Justice Cureton, as referred to by Mr. Justice Critz, is here inserted, as follows:

Opinion by MR. CHIEF JUSTICE CURETON. (132 S. W., 2d Series, 553.)

This case is before the Court by writ of error from the Court of Civil Appeals for the Sixth District. The opinion of that court may be found in 61 S. W. (2d) 185, and is here referred to for a general statement of the case. The Continental Oil Company, East Texas Refining Company, H. L. Hunt, and P. G. Lake, as plaintiffs in the trial court (defendants in error here), filed this suit against G. G. Turner and wife, Sina A. Turner, and the Gulf Production Company (plaintiffs in error here) to recover the oil and gas leasehold estate in a certain 311.72 acres of land, more or less, in Rusk County, Texas. The defendants in error claim title under an oil and gas lease from G. G. Turner and wife, Sina A. Turner, to C. M. Joiner, Trustee, dated April 7, 1927. The Gulf Production Company title is through and under a similar lease executed by the said G. G. Turner and wife, Sina A. Turner, to J. W. Pevey, dated July 25, 1930. At the time of the trial below the Gulf Production Company was in possession under its lease, had brought in seven producing wells, and was then drilling another, all at a cost to the company up to that time of $149,725.00. The suit was brought by defendants in error in the form of an action in trespass to try title, but they specially pleaded the Turner lease of April 7, 1927, and compliance with its terms as the source of their title. The primary question is: Which lease is to be given effect? The lease of defendants in error is in the usual form of oil and gas leases. G. G. Turner and wife, Sina A. Turner, are named as lessors, and *C. M. Joiner, Trustee,* as lessee.

The lease sets out the field notes of the land, was to run five years, and as long thereafter as oil or gas might be produced.

Both G. G. Turner and his wife first acknowledged this lease in statutory form on the 7th day of April, 1927, before G. P. Birdwell, Notary Public for Rusk County, Texas. More than three years thereafter, viz., on the 18th day of October, 1930, both G. G. Turner and his wife, S. A. Turner, again asknowledged the execution of this instrument, in statutory form, before James A. Copeland, Notary Public for Harris County, Texas. The lease was twice filed for record in Rusk County; first on the 15th day of April, 1927, and again on February 17, 1931.

The "drilling clause" of the lease reads:

"If no well be commenced on said land on or before the 7 day of April 1928 this lease shall terminate as to both parties, *unless* the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the First State Bank at Overton, Texas, or its successors, which shall continue as the depository, regardless of changes in the ownership of said land, the sum of Seventy Seven and 25/100 Dollars, which shall operate as rental and cover the privilege of deferring the commencement of a well for Six (6) months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the *lessee's option* of extending that period as aforesaid, and any and all other rights conferred." (Italics ours.)

The plaintiffs in error say that the above "unless" clause was never complied with, and that the lease terminated by its own limitations on April 7, 1928, long before Pevey, through whom Gulf Production Company claims, obtained his lease from the Turners. Defendants in error say in their pleadings that they claim *"through and under said lease, and subject to the terms of said lease,"* and *"upon which all delay rental obligations had been fully satisfied and discharged."*

Although Mr. and Mrs. Turner denied that anything of the sort ever took place, the jury, answering special issues, found that G. G. Turner and wife, Sina A. Turner, prior to April 7, 1928, accepted from Dan Cameron syndicate interest certificates purporting to cover the 80-acres Joiner discovery well tract (on the Daisy Bradford land), in satisfaction of the rentals payable under the lease for the three succeeding years, commencing April 7, 1928. The syndicate interest certificate transaction took place between G. G. Turner, alone and Dan Cameron, a representative of C. M. Joiner, Trustee,—Mrs. Turner not being present. Concerning the transaction, Cameron in part testified:

"I called on Mr. Turner at least a week and possibly two weeks prior to the date on which the rental was due to talk to him about the rental money and Mr. Turner was up on his barn or car shed and I went out there and went up there and told him that Mr. Joiner was having work and a hard time in

keeping the work up and well drilling and to pay the rentals and if he did have to continue to pay the rentals on the land down there that it would be impossible for him to continue to drill the well, because it was very difficult for him to get the money—and that the only thing he could do to keep the work going on down there was to get the folks that owned—that he had the land leased from, to accept in lieu of their rentals and in payment of their rentals the syndicate interest.

\* \* \* \* \* \* \* \*

"That was the syndicate interest in the well he was then drilling and Mr. Turner told me that he thought a good deal of Mr. Joiner and would do anything on earth to help him come out and he expressed himself that he had a very high regard for Mr. Joiner and also he knew that Mr. Joiner had been having an awful hard time to keep this well going \* \* \* Mr. Turner told me he was willing to accept the syndicate interest in the well for his rental and he said that there would not be any rentals anyhow if Mr. Joiner was not drilling and the rentals didn't amount to anything to him and he was glad to accept in lieu of the rentals the syndicate interest in this well down there.

\* \* \* \* \* \* \* \*

"I made out Mr. Turner a syndicate interest for his rentals and delivered it to him.

\* \* \* \* \* \* \* \*

"I had a pad of those forms like that, the original and the duplicate, and I had a carbon in between them and I made out this certificate and then I gave one copy to Mr. Turner and I kept one copy for Mr. Joiner's records.

\* \* \* \* \* \* \* \*

"At the time I gave him the certificate I made out a rental receipt and got Mr. Turner to sign it.

\* \* \* \* \* \* \* \*

"At the time of the transaction with Mr. Turner he agreed to settle with me for three years rentals, from April 7, 1928.

\* \* \* \* \* \* \* \*

"Mr. Turner signed the rental receipt for the three years."

The above transaction is the only basis for the claim that Joiner, Trustee, complied with the terms of the lease, and the Court of Civil Appeals held it was sufficient for that purpose.

The homestead of Turner and his wife was located on the land, and had been for more than fifty years. The Court of Civil Appeals held that after the execution of the lease by the Turners they had no homestead rights whatever in or to the property, in part saying:

"So the conveyance of the determinable fee by G. G. Turner and wife carried with it the exclusive right of possession, and that remaining in the Turners after the conveyance being only a right of reverter, not carrying with it a right of possession, until after the happening of the event that would terminate the estate, then no right of homestead could attach in favor of the Turners, a present right of possession being necessary for homestead rights to attach."

This holding is the basis of the court's conclusion that the syndicate interest certificate transaction was valid.

In our opinion, the terms of the lease negative any purpose to grant or to abandon the homestead or the possession of the premises, or any interest therein not necessary for carrying into effect the lease itself. The lease expressly states that Joiner, Trustee, and his vendees, *could not use the "water wells of the lessor"*; that *"when requested by lessor, lessee shall bury all pipe line below plow depth"*; that *"no well shall be drilled nearer than 200 feet to the house or barn on said premises, without the written consent of the lessor"*; and *"Lessee shall pay for damages caused by all operations to growing crops on said land."*

These clauses, it seems to us, show beyond dispute that it was contemplated by the very terms of the lease itself that Turner and wife should continue in possession of their home, house, wells, barn, and continue to cultivate the land, and make such use of it as could be made, in so far as might be consistent with the exercise of the right to drill and produce oil therefrom. Moreover, as to the surface of the land, the only grant made by the Turners was in the nature of an easement that it might be employed in the production of oil and gas. That surface, and everything in the land itself, except the minerals covered by the lease, was still *in their possession and was their property*, subject to a reasonable use, qualified only by the express provisions of the lease, to which we have made reference. Summers on Oil & Gas (Perm. ed.), vol. 4, sec. 652. So, it cannot be said, as the Court of Civil Appeals holds, that

the right of the Turners was only "a right of reverter not carrying with it a right of possession." Quite contrary to this conclusion of the Court of Civil Appeals is a paragraph in the reply of defendants in error to the application for writ of error filed in this cause, which reads:

"It has never been contended by defendants in error that they are entitled to the exclusive possession of the entire estate in the Turner land. *On the contrary, the title and right of the lessors, the Turners, to the use and occupancy of the surface of the land,* such as is reserved to every lessor under the ordinary oil and gas lease, *has never been and is not now in dispute.*" (Italics ours.)

This Court has long recognized the right of a landowner to sever the surface and mineral estates, and convey the latter without conveying or destroying the former. 31 Tex. Jur., p. 547, secs. 23, 24, 25, 26, 27, p. 601, sec. 49; Humphreys-Mexia Co. v. Gammon, 113 Texas 247, 254 S. W. 296; Lemar v. Garner, 121 Texas 502, 511, 50 S. W. (2d) 769; Munsey v. Mills & Garrity, 115 Texas 469, 482, 283 S. W. 754; Grissom v. Anderson, 125 Texas 26, 30, 79 S. W. (2d) 619. *The surface estate remaining in the lessor is one in fee simple, and includes the rights of possession, powers of control, occupancy, use and alienation.* Authorities *supra;* 31 Tex. Jur., p. 556, sec. 26, p. 601, sec. 49; Summers on Oil & Gas (Perm. ed.), vol. 4, sec. 652; Ferguson v. Steen, 293 S. W. 318; Rosson v. Bennett, 294 S. W. 660; Gregg v. Caldwell-Guadalupe Pick-up Stations, 286 S. W. 1083; Humble Oil & Refining Co. v. Wood, 292 S. W. 200; Humphreys Oil Co. v. Liles, 277 S. W. 100; Praeletorian Diamond Oil Assn. v. Garvey, 15 S. W. (2d) 698 (writ refused); Johnson v. Phillips Petroleum Co., 93 S. W. (2d) 556; Fowler v. Delaplain, 79 Ohio St. 279, 21 L. R. A. (N. S.) 100, 87 N. E. 260; Franz Corp. v. Pifer, 295 Fed. 106, 108; Schlegel v. Kinzie, 158 Okla. 93, 12 Pac. (2d) 223; Pulaski Oil Co. v. Conner, 62 Okla. 211, L. R. A. 1917C, 1190, 162 Pac. 464.

Of course, in a lease of this character the surface estate is servient to the mineral estate for the purposes of the mineral grant, but even this right is to be reasonably exercised with due regard to the rights of the owner of the surface. 31 Tex. Jur., p. 558, sec. 27; Mills-Willingham Law of Oil & Gas, pp. 250, 251, 252; Thornton on Oil & Gas (4th ed.), vol. 1, p. 249, sec. 82; 5th ed.), vol. 1, p. 235, sec. 131; Gregg v. Caldwell-Guadalupe Pick-up Stations, 286 S. W. 1083; Grubstake Inv.

Assn. v. Coyle, 269 S. W. 854; Brown v. Spilman, 155 U. S. 665, 39 L. Ed. 304; Gulf Pipe Line Co. v. Pawnee-Tulsa Petroleum Co., 41 L. R. A. (N. S.), pp. 1108, 1110; Summers on Oil & Gas, *supra*.

It is clear to us that the Turners did retain and have such possession and ownership of the homestead property as was sufficient for the homestead right to continue to attach. 22 Tex. Jur., p. 236, sec. 164, p. 243, sec. 169; Speer on Marital Rights (3rd ed.), 468; Wheatley v. Griffin, 60 Texas 209, 211; Swearingen v. Bassett, 65 Texas 267; Lee v. Welborn, 71 Texas 500, 9 S. W. 171; Stratton v. Westchester Fire Ins. Co., 182 S. W. 4 (writ refused); Finley v. Wakefield, 184 S. W. 755, 758 (writ refused); First Nat. Bank v. Dismukes, 241 S. W. 199.

Since we have determined that the Turners did continue to have a homestead estate in the land covered by the lease, it follows that the basis of the holding of the Court of Civil Appeals that Turner had the right to accept the syndicate certificates in continuation of the lease because no homestead rights existed (61 S. W. (2d) 188) passes out of the case, with the result that the conclusion of the court sustaining the validity of the transaction is necessarily erroneous.

The insistence here, however, is that since Turner had the right under the law, as head of the community, to collect, receive, and dispose of the proceeds of the homestead, he had the right to accept the syndicate interest certificates. We recognize the rule that the *proceeds* of a sale of the homestead property, *if personalty*, are subject to the control of the husband. 22 Tex. Jur., p. 130, sec. 92. *But here there were no proceeds.*

The lease here involved is an "unless lease," and imposed no obligation on Joiner, Trustee, to either drill or pay; and upon his failure to either drill, pay, or make the deposit in the named bank, no liability of any kind arose in favor of the Turners against him; nothing was due thereunder; there was nothing for Turner to collect; and nothing could be recovered. 31 Tex. Jur., p. 744, sec. 134 Davis v. Bussy, 298 S. W. 656 (writ refused); Weiss v. Claborn, 219 S. W. 884, 887 (writ refused); Stovall v. Texas Co., 262 S. W. 152, 153 (writ refused); McLaughlin v. Brock, 225 S. W. 575, 577; Jones v. Murphy, 253 S. W. 634; Summers on Oil & Gas (Perm. ed.), vol. 2, sec. 339.

The text of Texas Jurisprudence cited (sec. 134), in part reads:

"It is clear from the wording of the 'unless' clause that it does not operate to impose any duty upon the leasee *either to drill or to pay delay rentals;* the matter is entirely optional with him, and the lessor cannot compel him to drill nor oblige him to pay rentals." 31 Tex. Jur., p. 744, sec. 134. (Italics ours.)

That the Court of Civil Appeals misinterpreted the meaning of the *'unless'* clause before us is plainly shown in one of the concluding sentences in its opinion, wherein the court said:

"Turner's written authority to demand money in payment of rentals did not restrict his right to accept property in satisfaction thereof." 61 S. W. (2d) 188.

The error in this is obvious. Turner had no written authority, nor any other authority, under the lease to *demand* money in payment of rentals. *There were no rentals due, and under the lease there was no obligation due the Turners for the payment of which he could demand money.* The defendants in error "do not dispute" this proposition as applicable to an "unless lease." On page 48 of their "Reply * * to printed arguments filed by plaintiffs in error * *" in this Court, they say:

"It is insisted in all the arguments that there is never any obligation to pay the rentals that, at the option of the lessee, may be paid under an 'unless' lease. *The defendants in error do not dispute that proposition.*"

For the reasons stated, we are clear that Turner, under the rules of law which permit him to collect community debts, or settle obligations due the community, did not have authority to accept the syndicate interest certificates for the continuance of the lease on the homestead.

The result of the failure of Joiner, Trustee, to either begin a well, pay the specified amount of money, or make the named deposit by April 7, 1928, was to *ipso facto* terminate the lease, and the Turners became reinvested with the entire estate without the necessity of re-entry, declaration, or legal action. 31 Tex. Jur., pp. 744, 745, 746, sec. 134; Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 520, 19 S. W. (2d) 27; Humble Oil & Ref. Co. v. Davis, 296 S. W. 285, 287 (Tex. Com. App.); Mitchell v. Simms, 63 S. W. (2d) 371, 373 (Tex. Com. App.);

Weiss v. Claborn, 219 S. W. 884 (writ refused); Wilson v. Gass, 289 S. W. 141, 142 (writ refused); Morrissey v. Ambrugey, 292 S. W. 255, 256 (writ refused); Thornton on Oil & Gas (5th ed.), vol. 1, sec. 124; Summers on Oil & Gas (Perm. ed.), vol. 2, pp. 217, 218, sec. 337; Empire Gas & Fuel Co. v. Saunders, 22 Fed. (2d) 733, 735 (writ of certiorari dismissed), 278 U. S. 581.

The "unless" provisions of the lease, therefore, are obviously a *limitation* on the grant; since *"a limitation determines an estate upon the happening of the event itself without the necessity of doing any act to regain the estate, such as re-entry."* Thompson on Real Property, vol. 3, sec. 2092. (Italics ours.) Summers on Oil & Gas (Perm. ed.), vol. 2, sec. 337, p. 215; Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 519, 520; Humble Oil & Ref. Co. v. Davis, 296 S. W. 285, 287; Caruthers v. Leonard, 254 S. W. 779, 782; Morrissey v. Amburgey, 292 S. W. 255, 256 (writ refused); authorities *supra.*

Under the statutes of Texas, the estate conveyed in a grant is "deemed a fee simple, if a less estate be not limited by express words, or do not appear to have been granted * * *;" R. S., Art. 1291. By reason of this statute, the intent to convey an estate in fee simple will be presumed where a less estate is not expressly and unequivocally declared. 14 Tex. Jur., p. 933, sec. 155; May v. S. & A. P. Townsite Co., 83 Texas 502, 508, 18 S. W. 958; Lindsay v. Freeman, 83 Texas 259, 263, 18 S. W. 727.

The conditions under which the lease before us could continue, and the length of time it could endure, were, *under the statute, just as much a part of the grant as the title to the oil and gas, or surface easement.*

It therefore appears that the "unless" provisions of the lease here involved, being words of limitation, the purpose of which is to specify *"the term of continuance or duration"* of the estate, *constitute an integral part of the very grant itself required by statute in order to prevent the grant from being one in fee simple.*

From Cameron's testimony, quoted above, it is apparent that the agreement between Cameron and Turner to extend the Turner lease for three years from April 7, 1928, for the syndicate interest certificates, was not in writing, but was verbal.

So, what we really have before us is a parol agreement of Turner to accept the syndicate interest certificates for the three years' rental named in the lease, a written document called a syndicate interest certificate, the contents of which we do not know, and according to the so-called duplicate in the record, a receipt for money, although no money was paid, signed by Turner, alone, but unacknowledged, for three years' rental.

Since the oral modification of the lease extended it for three years upon a new and different option and consideration to that written in the lease, changed by oral agreement the limitations written in the grant in compliance with the statute (R. S., Art. 1291), quoted above, it is obvious that it was in violation of both the Statute of Frauds and the Statute of Conveyances. R. S., Arts. 3995, 1288; 20 Tex. Jur., p. 215, sec. 6, pp. 283, 284, secs. 73, 74; Adams v. Hughes, 140 S. W. 1163, 1169 (writ refused); Burgher & Co. v. Canter 190, S. W. 1147; Schofield v. Pyron, 257 S. W. 350; Kistler v. Latham, 255 S. W. 983, 985.

The defendants in error, under the lease as thus modified by the oral agreement, have a lease for some terms of which they must go to the original and executed document, and for others to the oral modification. It is quite elementary that in such a case the oral modification of a contract falling within the Statute of Frauds is itself within the statute. In fact, it may be correctly said that the oral modification of the written agreement creates a new contract, resting entirely in parol. 20 Tex. Jur., p. 213, sec. 6, p. 283, secs. 73, 74; Ickert v. Minor, 22 S. W. (2d) 741, 743; McDonald v. Whaley, 244 S. W. 596, 598; Gardner v. Sittig, 188 S. W. 731; Allen v. Mulkey, 19 S. W. (2d) 936, 945; Kistler v. Latham, 255 S. W. 983, 985; Adams v. Hughes, 140 S. W. 1163; Beard v. Gooch, 130 S. W. 1022; Burgher v. Canter, 190 S. W. 1147; Ford Motor Co. v. Maddox Motor Co., 23 S. W. (2d) 333, 338.

This is necessarily so, because only by parol can it be ascertained what portion of the written instrument is to remain effective and what portion has been eliminated or suspended by the syndicate interest certificate transaction. So, what we really have is a parol conveyance of an oil and gas lease on the Turner lands. The jury found that the syndicate interest certificates were delivered, but this does not take the contract which now rests entirely in parol out of the Statute of Frauds. In order to do this, not only must the consideration

be paid, but possession must be delivered and valuable improve-ments made, neither of which was done. The agreement, there-fore, cannot be enforced. 20 Tex. Jur., pp. 328, 337, secs. 116 to 124; Hooks v. Bridgewater, 111 Texas 122, 229 S. W. 1114; Ward v. Etier, 113 Texas 83, 251 S. W. 1028; Bradley v. Owsley, 74 Texas 69, 11 S. W. 1152; Varter v. Portwood, 26 S. W. (2d) 422, 426; Leverett v. Leverett, 59 S. W. (2d) 252, 254 (writ refused); City of N. Y. Ins. Co. v. Middleton, 62 S. W. (2d) 681, 682; Francis v. Thomas, 129 Texas 579, 106 S. W. (2d) 257, 261 (Tex. Com. Appls.)

The contract as modified by the oral agreement, being a conveyance of real estate without being in writing, was equally violative of the Statute of Conveyances. R. S., Art 1288; Allen v. Allen, 101 Texas 362, 365, 107 S. W. 528; Priddy v. Green, 220 S. W. 243, 248; Texas Co. v. Tankersley, 229 S. W. 672.

Defendants in error's proposition that the acceptance of the syndicate interest certificates in lieu of money was a mere substituted method of performance, is without merit. "A sub-stituted method of performance" necessarily presupposes a contract to be *performed* and an obligation to be satisfied; other-wise, there is no "method of performance" for which some other method may be "substituted." In the lease before us *there was no obligation to be performed,* and therefore no method of per-formance for which something else could be substituted. Joiner had an option (is is called the *"lessee's option"* in the drilling clause previously quoted) to continue the lease, but he could not effectively exercise it by delivery of syndicate interest cer-tificates, because that was not one of his options. Options must be accepted according to their terms, and leases of the char-acter before us must be strictly complied with. 43 Tex. Jur., p. 100, sec. 62; 31 Tex. Jur., p. 759, sec. 141, p. 762, sec. 144, p. 764, sec. 145, p. 767, sec. 146. So, what actually took place was not a "substituted method of performance," but a substitution of another option for those named in the written lease, or the incorporation in the agreement of a fourth option, resting in *parol* to the effect that if Joiner would deliver the syndicate interest certificates, the lease should be continued for three years. But the lease was an "unless" lease, and under it the options specified in the written document, in connection with the termination clause, were "limitations on the grant," an integral part of the very grant itself, required by the statute (R. S., Art. 1291) to prevent the passage of a fee simple title; which, of course, could not be changed by parol. The delivery

of the certificates was not a "substituted performance" of the original agreement, but an original performance of the parol option attempted to be incorporated in the written document for the purpose of changing the limitations of the grant, in violation of the statutes.

Defendants in error in their brief filed here on the proposition that the "unless" provisions of an oil and gas lease express a "condition subsequent," instead of a "limitation," (pages 49 and 50) concede that the doctrine of "substituted performance" can have no application to a grant upon a limitation. They say that a grantor *"cannot waive the results of the happening of an event to which the duration of an estate is limited,"* and (on page 48) "The grantor may waive or be estopped to assert the breach of a condition, or he may accept a substituted performance of it by parol, *while he cannot do so in the case of a limitation."* (All italics ours.)

Cases and authorities cited by defendants in error relative to parol modifications of actual obligations to pay rent, or actual obligations to pay royalties, or changing the method of paying royalties, have no application here, since these involve substituted methods of performing actual obligations; not, as here, the addition of a parol option and the substitution of an oral limitation for those written in the grant.

The limitation in the lease was imposed on the grant by Mrs. Turner, the wife, *and operated in protection of her homestead right; and* G. G. Turner, the husband, alone, could no more enlarge, modify, or change it than he could alone make a valid grant or lease in the first instance, or change the determinable fee into a complete fee simple title, or the surface easement into a complete conveyance. The authorities declare the husband alone cannot contract for the renewal or extension of an obligation on the homestead, or that the *burden of an encumbrance may not be increased thereon without the wife's consent, etc.* 22 Tex. Jur., pp. 122, 123, sec. 86; 23 Tex. Jur., p. 271, sec. 236. "In a legal sense, the word 'encumbrance' means 'an estate of interest or right in lands diminishing their value to the general owner, a paramount right in or weight upon land which may lessen its value'." Thompson v. Locke, 66 Texas 383, 387, 1 S. W. 112; 17 Tex. Jur., pp. 103, 104, sec. 2; City of Dayton v. Allred, 123 Texas 60, 73, 68, S. W. (2d) 172; Stambaugh v. Smith, 23 Ohio St. 584, 591; Adams v. Reed, 11 Utah, 480, 40 Pac. 720, 723; Words & Phrases (1st ed.), vol.

4, p. 3522; Flood v. Graham, 61 Fla. 207, Anno. Cas. 1912D, p. 1137; Words & Phrases (2nd series), vol. 2, pp. 1018-1022; Words & Phrases (4th series), vol. 2, pp. 317, 319; Words & Phrases (3rd series), vol. 4, pp. 198-201; Krotzer v. Clark, 178 Calif. 736, 174 Pac. 657, 658; Thackeray v. Knight, 57 Utah 21, 192 Pac. 263, 265; Nancey v. Cheney, 67 Mont. 56, 214 Pac. 647, 649; Elliott on Roads and Streets (4th ed.), vol. 2, sec. 921; Forster v. Scott, 136 N. Y. S. 577, 32 N. E. 976, 18 L. R. A. 543; Blackie v. Hudson, 117 Mass. 181; Cadmus v. Fagan, 47 N. G. L. 549, 4 Atl. 323; Kellogg v. Ingersoll, 2 Mass. 96, 101; Tuskegee Land Co. v. Birmingham R. Co. 161 Ala. 542, 49 So. 378, 23 L. R. A. (N. S.) 992; Mackey v. Harmon, 34 Minn. 168, 24 N. W. 702; Demars v. Koehler, 62 N. J. L. 203, 41 Atl. 720, 72 A. S. R. 642. The last authorities cited hold that easements, including the right to take water, which is a mineral (40 Corpus Juris, p. 738, sec. 12) are within the quoted definition of "encumbrances." It is therefore obvious that the husband alone cannot change or modify limitations imposed by the wife in an original oil lease; for certainly a change in the limitation on the grant, in the conditions, compliance with which was necessary to its continuance, the purpose and claimed effect of which was to continue the grant for three years, was an "encumbrance," which diminished the value of the homestead property of Mrs. Turner. The husband cannot even accept a less amount of consideration than that specified in the wife's deed, and bind the wife. Cole v. Bammel, 62 Texas 108; Stallings v. Hullum, 89 Texas 431, 35 S. W. 2; Dodd v. Daniel, 89 S. W. (2d) 494.

These cases rest upon the principle that a change in the consideration to be paid for the homestead from that specified in the deed signed and acknowledged by the wife has the effect of making the conveyance upon terms which were not in her deed, and therefore not binding upon her.

In the case before us the principle applies with greater force than in the cases cited, because the effect of the syndicate certificate transaction was not only to substitute another and different consideration for that named in the lease, but at the same time to change the limitations of the grant, and cause its continuance for three years upon delivery of the certificate, an option not specified in the lease at all, a transaction resting entirely in parol. As said in Cole v. Bammel, cited above, *"Such a proceeding imposes upon the wife a different contract from that which she had explained to her, and, in effect, forces upon*

*her a conveyance she may have been unwilling to execute.* \* \* \* *and the beneficial design of the statute* (R. S., Art. 1300) *is frustrated."*

Mrs. Turner's joinder was necessary in the creation of the limitation in the lease in the first instance, and is equally necessary to any valid change of this limitation. It would be an idle and futile thing for the Constitution and the statutes to require the joinder of the wife in the execution of the lease before us; to require her to separately acknowledge it after its contents *as written* had been explained to her by the notary; and to require the wife to limit the estate granted by express words if she desired it to be limited (R. S., Art. 1291), if the husband alone could modify or change the limitation on the grant imposed by her in her conveyance.

We are of the opinion that the syndicate interest certificate transaction was not only in violation of the Statute of Frauds and the Statute of Conveyances, as we have shown, but was in violation of the statutes governing homestead conveyances by husband and wife; was void as to Mrs. Turner, the wife; should not have been admitted in evidence in the first instance; and could not form the basis of a judgment in favor of defendants in error.

Mrs. Turner is not estopped as to her homestead by the syndicate interest certificate transaction, even though she did accept the certificates, or ratify the transaction, since there is no fraud shown on her part. 22 Tex. Jur., p. 137, sec. 96; 23 Tex. Jur., p. 315, sec. 275; Cauble v. Worsham, 95 Texas 86, 93; Durham v. Luce, 140 S. W. 850, 855; Raniel v. Mason, 90 Texas 240, 244, 38 S. W. 161; McLaren v. Jones, 89 Texas 131, 135, 33 S. W. 849; Huss v. Wells, 17 Texas Civ. App. 195, 44 S. W. 33, 34 (writ refused); Owens v. New York & P. Land Co., 11 Texas Civ. App., 284, 32 S. W. 189, 190, 1057, 1060; Washington v. City of Houston, 60 S. W. (2d) 519, 522 (writ refused); Keels v. Metzler, 94 S. W. (2d) 799, 805; Speer's Law of Marital Rights (3rd ed.), secs. 197, 276.

Since the terms of the lease necessary to its continuance were not complied with by Joiner, Trustee, the lease automatically terminated on April 7, 1928, and from that date the whole title to the land here involved, including the mineral estate, was in Turner and wife; and they were at liberty to convey it to another. Mitchell v. Simms, 63 S. W. (2d) 371; authorities *supra.*

In addition to the foregoing, we have concluded that the lease was absolutely void as to the homestead, for the reason that Birdwell, the notary public who took the acknowledgments of Mr. and Mrs. Turner, was interested as a part owner or beneficiary of the estate conveyed, and was therefore disqualified to take the acknowledgments.

Birdwell's disqualification arose out of the following facts: On March 29, 1927, C. M. Joiner, Trustee, and W. D. Tucker entered into a partnership agreement, acknowledged by both Joiner and Tucker before G. P. Birdwell, a notary public, and its validity is not questioned. This agreement made Joiner, Trustee, and Tucker partners in the ownership of all oil and gas leases then in the name of C. M. Joiner, Trustee, in all leases originally taken in the name of Citizens Lease Syndicate, but controlled by Joiner, Trustee, *in all other leases and royalties to be acquired,* and in all oil and gas wells to be drilled.

On March 30, 1927, W. D. Tucker assigned one-half of his one-fourth interest in the partnership thus created to Sam Warren, Trustee for *G. P. Birdwell* and other named parties. This assignment was attached as an addendum to the original partnership agreement between Joiner and Tucker referred to above; and the two documents thus attached were filed for record on August 19, 1930, and were recorded as one instrument. Both instruments (omitting acknowledgments) are copied in the margin at the end of this opinion. [1] [2] (See pages 235, 236).

The assignment from Tucker to Warren, Trustee, was acknowledged by Tucker before *G. P. Birdwell,* notary public, who was, of course, disqualified by reason of interest to take the acknowledgment. 1 Tex. Jur., pp. 442-445, secs. 32, 33, 34, 36. But the instrument was valid as between the parties without the acknowledgment. 1 Tex. Jur., p. 417, sec. 8.

This instrument plainly gave Birdwell a beneficial interest in all the property which had been assigned to Tucker by Joiner, Trustee, and an interest in all oil and gas lease to be thereafter acquired for the use and benefit of the Joiner-Tucker partnership, as well as in all oil wells, etc.

Tucker, in carrying out his part of the Joiner-Tucker agreement to procure as many leases as possible in the name of C. M. Joiner, Trustee, on April 7, 1927, obtained the lease here involved from the Turners, which was acknowledged by both

Mr. and Mrs. Turner before *G. P. Birdwell* as notary, who, being *beneficially interested in the lease,* was disqualified to take the acknowledgments. 1 Tex. Jur., p. 442, sec. 32, p. 443, sec. 33, p. 444, sec. 34, p. 446, sec. 36; 1 Am. Jur., p. 334, sec. 52; Corpus Juris Secundum, p. 824, secs. 53, 53d; 1 Corpus Juris, p. 802, sec. 110.

The knowledge of Tucker, partner of Joiner, and agent of the partnership, of Birdwell's disqualification was notice to Joiner and the partnership of such disqualification. Gary v. McKinney, 239 S. W. 283.

The acknowledgment of Mrs. Turner having been taken by Birdwell, a disqualified notary, was absolutely null and void, "is as though it had never been written, is mere waste paper, is not her act and deed, and is wholly ineffectual to divest her of her title." 1 Tex. Jur., pp. 517, 519, secs. 114, 115, 116, p. 535, sec. 133; 22 Tex. Jur., p. 122, sec. 86; Workman's Mutual Aid Assn. v. Monroe, 53 S. W. 1029 (writ refused); Bexar Building & Loan Assn. v. Heady, 21 Texas Civ. App. 154, 50 S. W. 1079, 1080 (writ refused); same case, 21 Texas Civ. App. 154, 57 S. W. 583; Miles v. Kelley, 40 S. W. 599, 602; Silcock v. Baker, 25 Texas Civil App. 508, 61 S. W. 939, 940; Rothschild v. Daugher, 85 Texas 332, 20 S. W. 142.

This rule applies to oil and gas leases the same as it does to other conveyances of the homestead property. 22 Tex. Jur., p. 128, sec. 90; 31 Tex. Jur., p. 587, sec. 44.

. It is unnecessary to decide the effect of this void deed in the hands of an innocent purchaser (as was done in Workman's Mutual Aid Assn. v. Monroe, *supra*), since we have concluded defendants in error are not of that class.

The defendants in error say that, since their title comes through C. M. Joiner, Trustee, the intervening instruments which disclose Birdwell's disqualification to take the Turner acknowledgments do not convey notice to them, because "not in" their "chain of title"; and that they are not charged with notice of any infirmities in the acknowledgments, because of Revised Statutes, Article 7425a.

The two rules invoked have no application here.

The general rule as to notice to a purchaser of realty is stated in 43 Texas Jurisprudence, p. 647, sec. 383, as follows:

"It is a general rule that the purchaser is charged with notice of the existence, contents, and legal effects of all instruments contained in his chain of title or connected therewith. *He is bound by every description, recital, reference and reservation, and by every other matter contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims. This is so regardless of whether the instrument is recorded or whether he has actually seen or read it, or has any knowledge of its contents.*

"*Accordingly, the purchaser is charged with knowledge of any equity or interest of a third person which is disclosed or recognied by a conveyance through which he claims, as well as notice of any fact recited or revealed in such conveyance, in the certificate of acknowledgment, or in another instrument to which the conveyance refers.* And when a fact is recited which is sufficient to put a prudent man on inquiry, the purchaser is charged with notice of facts which might have been ascertained by a proper inquiry." (Italics ours.)

See, also, 31 Tex. Jur., pp. 376-378, sec. 11; 20 R. C. L., p. 353, sec. 15; 27 R. C. L., p. 715, sec. 481; authorities *post.*

In the instant case, the title of defendants in error comes by mesne conveyance through C. M. Joiner, Trustee. The addition of the word *"Trustee"* to Joiner's name was sufficient to convey notice that Joiner was but a trustee, and put defendants in error upon inquiry as to the character of trust under which he acted, and the extent and limitations of his authority. 20 R. C. L., p. 354, sec. 15; 42 Tex. Jur., p. 732, sec. 116, p. 733, sec. 117; Stone v. Kahle, 22 Texas Civ. App. 185, 54 S. W. 375, 377; Carelton v. Roberts, 1 Posey, pp. 587, 594; Merriman v. Russell, 39 Texas 278, 284; Mercantile National Bank v. Parsons, 54 Minn. 56, 55 N. W. 825, 40 Am. St. Rep. 299; Kennell v. Herbert, 342 Ill. 464, 174 N. E. 558; Shaw v. Spencer, 100 Mass. 382, 389; 97 Am. Dec. 107; 1 Am. Rep. 115; Welles v. Larrabee (U. S.), 36 Fed. 866, 870; 2 L. R. A. 471; Johnson v. Calnan, 19 Colo. 168, 34 Pac. 905, 908; 41 Am. St. Rep. 224; Marbury v. Ehlen, 72 Md. 206, 19 Atl. 648, 20 Am. St. Rep. 467; Fisher v. Brown, 104 Mass. 259, 6 Am. Rep. 235; Loring v. Salisbury, 125 Mass. 138.

As stated above, on the 29th day of March, 1927, C. M. Joiner, Trustee, and one W. D. Tucker entered into an agreement, which is copied in the margin at the end of this opinion.[1]

*By this instrument, it is obvious that Joiner, Trustee, assigned a one-fourth interest in all the leases which he then owned and all to be thereafter acquired in the name of Joiner, Trustee, to Tucker for the one thousand dollars,* etc. The agreement states that both Joiner, Trustee, and Tucker "mutually agree to use their best endeavor to increase our holdings and handle them to best advantage, * * *" It further provides that "all expenses thereto to be paid out of the first proceeds derived from sale of any property jointly owned by assignor and assignee." The instrument goes into some detail in regard to the method of operation, not necessary to be stated here.

It is perfectly clear from this agreement that it created a joint working, as well as a joint ownership, partnership between Joiner and Tucker for the purpose of engaging in the business of obtaining leases and producing oil and gas. 32 Tex. Jur., p. 215, sec. 21, pp. 217, 218, sec. 2, p. 227, sec. 8, p. 244 sec. 20.

For these reasons, it was a *mining partnership*. 29 Tex. Jur., p. 698, sec. 32; Summers on Oil & Gas (Perm. ed.), vol. 4, secs. 722-724; Munsey v. Mills & Garrity, 115 Texas 469, 283 S. W. 754; Wagner Supply Co. v. Bateman, 118 Texas 498, 18 S. W. (2d) 1052.

All the property of the parnership at the time of its creation stood in the name of Joiner, Trustee, or was owned and controlled by him; but his agreement to hold it for the use and benefit of the partnership was sufficient to create a trust. 26 R. C. L., p. 1182, sec. 19.

All leases to be acquired after the creation of the partnership were to be taken in the name of "C. M. Joiner, Trustee," but were to be partnership property. This, of course, created a trust. 42 Tex. Jur., 668, sec. 60; 47 C. J., pp. 757, 758, sec. 190.

In the instrument itself, however, Joiner is named as *"trustee"* in conformity with the legal effect of the agreement. In fact, it may be said that the partnership agreement between Joiner, Trustee, and Tucker not only named Joiner as Trustee, but declared the terms and purposes of the trust, and by its registration notice was given to all the world that the property comprised was held under the terms of the agreement; and subsequent purchasers could not claim that they took in ignorance of the trust. 42 Tex. Jur., p. 733, sec. 117; Merriman v. Russell, 39 Texas 278.

The partnership agreement between Joiner, Trustee, and Tucker was executed on March 29, 1927. One of the additional leases which was secured in the interest of the partnership was that from the Turners to Joiner, Trustee, *the identical lease involved in this suit,* secured on April 7, 1927. Obviously, under the facts, this lease is within the terms of the working partnership agreement, and Tucker took title to a one-fourth interest therein.

The statute invoked (R. S., Art. 7425a), as giving Joiner, Trustee, plenary power to convey the property of the partnership trust, clearly has no application. The statute in part declares:

"Where a trust is created, but is not contained or declared in the conveyance to the trustee, * * *"

Here the Joiner-Tucker agreement declares the trust and defines and limits the powers of the trustee. In such case the rule is that the trustee must strictly follow the prescribed mode of exercising his powers. 42 Tex. Jur., p. 718, sec. 104, p. 714, sec. 99; Ryan v. Porter, 61 Texas 106; Bowman v. Oakley, 212 S. W. 549 (writ refused); Haldeman v. Oppenheimer, 103 Texas 275, 126 S. W. 566; Wisdom v. Wilson, 59 Texas Civ. App. 593, 127 S. W. 1128, 1135 (writ refused); Kennedy v. Pearson, 109 S. W. 280, 283 (writ refused).

The agreement of Joiner, Trustee, and Tucker in part declares:

"It is expressly understood and agreed that in the deposition of any of the property, it must be done with the consent of both parties thereto."

It is obvious that the word "deposition" used in the quotation, and in the instrument as copied in the statement of facts, is a typographical error for the word "disposition," and we are so treating it. The provision is consistent with the general rule of law that one partner has no implied authority to sell or convey the firm's real estate, but may with the consent of the other partner convey partnership land. 32 Tex. Jur., p. 290, sec. 44, p. 336, sec. 75; Theis v. Curts, 33 S. W. (2d) 754, 758; Slayden & Co. v. Palmo, 53 Texas Civ. App., 227, 117 S. W. 1054; Williams v. Meyer, 64 S. W. 66, 69 (writ refused); 20 R. C. L., p. 905, sec. 116; 47 Corpus Juris, p. 854, sec. 323.

The effect of this clause in the instrument was to prevent Joiner, Trustee, from exercising the power to convey under the statute (Art. 7425a) invoked to support such authority in this case.

It is plain that Joiner, Trustee, could not sell the Joiner-Tucker property either as trustee or partner without Tucker's consent. 42 Tex. Jur., p. 718, sec. 104; 32 Tex. Jur., p. 335, sec. 75; authorities *supra*. But Tucker could not consent, because he had conveyed one-half of his one-fourth interest to Warren, Trustee, for Birdwell and others, (2) (see page 236) by virtue of which, under the law applicable to mining partnerships, Warren, Trustee, had become a partner with Joiner, Trustee, and Tucker in the enterprise. Summers on Oil and Gas (Perm. ed.), vol. 4, sec. 725; Indiahoma Refining Co. v. Wood, 255 S. W. 212, 214; Munsey v. Mills & Garrity, 115 Texas 469, 484, 283 S. W. 754.

In order that sales of leases might be consummated by Joiner, Trustee, all the interested parties, including Tucker, executed conveyances sufficient to place the whole title in Joiner, Trustee, *and to evidence their consent to sales,* before Joiner, Trustee, ever undertook to convey the lease to those through whom defendants in error claim title. For this purpose they executed two instruments, one of which conveyed the title and interests of Tucker and of Sam Warren, as trustee, to Joiner, Trustee; the other ratified Warren's conveyance, and conveyed the title of those for whose benefit Sam Warren was trustee to Joiner. The first instrument or assignment,—that executed by W. D. Tucker and San Warren on the 12th day of September, 1930,—was properly acknowledged and duly filed for record on the same date. It reads in part as follows:

"ASSIGNMENT OF OIL AND GAS LEASE.

"Whereas, on the 29th day of March, 1927, a certain agreement or assignment was made and entered into by and between C. M. Joiner, Trustee, and W. D. Tucker, said instrument being of record in Volume 148 pages 456-7 Deed Records Rusk County, Texas, and whereas, on the 30th day of March 1927 W. D. Tucker for a valuable consideration assigned a one-half interest in and to said agreement or assignment to Sam Warren, trustee for the following, towit:

"J. H. Silvey_____$ 50.00     Walker Wilson _____$500.00
"Sam Warren _____ 50.00     V. E. Minor_____ 100.00
"W. E. Florey ____ 50.00     *G. P. Birdwell*_____ *100.00*
"McGuerin _____ 100.00     Lee Gipson _____ 50.00

as their interests appear, the said last assignment to said Sam Warren, Trustee, by W. D. Tucker, being attached to the original agreement or assignment above referred to *and reference is here made to the original instrument with the adenda assignment and the records of same of all purposes, especially for a description of the property herein conveyed; * *""

The instrument then recites the assignment of a one-fourth interest in the Joiner, Trustee, leases, properties, etc., covered by the original partnership and trust agreement between Joiner, Trustee, and Tucker heretofore described, and all leases and royalties to be acquired thereunder,—in fact, describing fully the contents of the Joiner-Tucker partnership agreement; and states that the "undersigned" (Tucker and Warren, Trustee) are the owners of a one-fourth undivided interest in and to all leases, royalties, rights, titles, and equities set forth in the original agreement between Joiner, Trustee, and Tucker. The instrument then, upon a named consideration conveys the property to "C. M. Joiner, Trustee, and *his heirs, successors, and assigns.*" They also "covenant with the said assignee, *his heirs, successors or assigns, that the undersigned are the lawful owners of said property above mentioned* and rights and interests thereunder; that the undersigned *have good right and authority to sell and convey the same, * *""

"Executed this the 12 day of September, A. D. 1930.

"W. D. Tucker     Sam Warren."     (All italics ours.)

The second instrument, signed and acknowledged by Birdwell and others, beneficiaries under the Sam Warren, Trustee, assignment from Tucker, was executed and filed for record on October 1, 1930. The first two paragraphs of this instrument are the same as those quoted above in the conveyance from Tucker and Warren to Joiner, Trustee.

The conveyance then recites the execution of the instrument just above described, and declares that Sam Warren had "full right, power and authority as our Trustee to execute said instrument," and ratifies and confirms the conveyance of Warren, Trustee, to Joiner described above.

The instrument then declares that the grantors "do hereby bargain, *sell, transfer, assign and convey* all rights title or interests in and to all of the said property hereinabove referred to, * * to C. M. Joiner, Trustee, and his *heirs, principals, successors and assigns.*

"TO HAVE AND TO HOLD the above described premises together with all and singular the rights and appurtenances thereto in anywise belonging unto the said C. M. Joiner, Trustee, his *heirs principals, successors and assigns,* forever, *and we do hereby bind ourselves, our heirs, executors and administrators to warrant and forever defend all and singular the said premises unto the said C. M. Joiner, Trustee, his heirs, principals, successors and assigns against every person whomsoever, lawfully claiming or to claim the same or any part thereof, by, through or under us.*

"Executed this the 1st day of October, A. D. 1930.

| | |
|---|---|
| "G. P. Birdwell, | Walker Wilson, |
| "W. E. Florey, | V. E. Minor, |
| "Bernice Florey, | Lee Gipson, |
| "M. C. DeGuerin, | Sam Warren." |
| "J. H. Silvey, | (All italics ours.) |

The above-described instruments were both executed and filed for record long before Joiner, Trustee, executed the conveyance through which the defendants in error claim, one of which, to H. L. Hunt, Trustee, was executed November 26, 1930, filed for record December 1, 1930, and the other to W. D. Tucker and D. F. Cameron was executed March 20, 1931, and filed for record on the day of its execution.

Each of the above-described conveyances to Joiner, Trustee, refers to and gives complete descriptions of the original agreement between Joiner, Trustee, and Tucker, and of the assignment from Tucker to Sam Warren, Trustee for Birdwell and others. In fact, the originals of said instruments, and their recordation, are referred to "for all purposes." *Each shows the names of the beneficiaries for whom Warren is made trustee in the assignment from Tucker to Warren, Trustee, including G. P. Birdwell.* Each conveys the title of the grantors to C. M. Joiner, Trustee, the conveyances in each running to *"C. M. Joiner, Trustee, and his heirs, successors and assigns."* This language is repeated in various clauses intalicized above in the two instruments, including a special covenant of ownership and

right to convey in one, and habendum and special warranty clauses in the other.

The parties to these two instruments, by using the words or phrases quoted, and those italicized as stated, by which the grants were made to Joiner, Trustee, *"his heirs and assigns, * * his heirs, successors and assigns,"* or warranties or covenants made in the same, as well as in the "To have and to hold" (habendum) clause in the last conveyance above described, to Joiner, Trustee, *"his heirs, principals, successors and assigns,"* by use of the word *"assigns"* necessarily import an unrestricted right on the part of Joiner, Trustee, to assign the properties conveyed. Penick v. Eddleman, 291 S. W. 194, 195 (Tex. Com. Appls.) ; Johnson v. Morton, 28 Texas Civ. App. 296, 67 S. W. 790, 791 (writ refused).

In fact, these conveyances in placing the whole title in Joiner, Trustee, effectuated a merger of the legal and equitable estates by a surrender on the part of the beneficiaries of all their rights to the trustee, and thus terminated the trust, giving Joiner an unrestricted right to convey. 26 R. C. L., p. 1211, sec. 53. These two instruments are necessarily in defendants in error's chain of title, for the reason that but for them Joiner, under the terms of the partnership and trust agreement, as well as the general law of partnership, would have had no authority to execute the conveyances under which the defendants in error claim title to the property in controversy.

The effect of the above-described conveyances to Joiner, Trustee, *was to put defendants in error upon notice that G. P. Birdwell owned a beneficial interest in the property acquired, and to be acquired, under the Joiner-Tucker partnership.* Authorities *supra. Moreover, they show that Tucker conveyed one-half of his one-fourth interest with Joiner to Warren, Trustee, for named beneficiaries, including G. P. Birdwell, on the 30th day of March, 1927, which was prior to the date that Birdwell took the acknowledgments of Mr. and Mrs. Turner to the lease in controversy in this case; and show beyond the possibility of controversy that Birdwell was disqualified to take the Turner acknowledgments.*

It will be noted that both these conveyances not only give the facts as to the assignment by Tucker of one-half of his one-fourth interest in the Joiner, Trustee, leases to Sam Warren, Trustee, for certain named parties, including *G. P. Bird-*

*well,* but make particular reference to the assignment, and state that the same is attached to the original partnership and trust agreement between Joiner and Tucker, and (quoting) "reference is made to the original instrument with the adenda (adendum) assignment, and the records of same for all purposes." This, of course, had the effect of making the Joiner-Tucker agreement, by which Tucker acquired a one-fourth interest in the Joiner properties, and the Tucker-Warren assignment, in which the interest of Birdwell and other beneficiaries is disclosed, part of each of these instruments, irrespective of the question of the validity of the acknowledgment to the Tucker-Warren assignment, and as to whether or not it should have been filed for record. 10 Tex. Jur., p. 288, sec. 167; Smith v. City of Navasota, 72 Texas 422, 427, 10 S. W. 414; 31 Tex. Jur., p. 376, sec. 11; 43 Tex. Jur., p. 647, sec. 385, pp. 651, 653, sec. 384; 36 Tex. Jur., p. 506, sec. 64; Simmons v. Johnson, 14 Wis. 523, 526-7; Jarstadt v. Morgan, 48 Wisc. 245; 4 N. W. 27-29; Fleischfresser v. Schmidt, 41 Wis. 223, 227; 23 R. C. L., p. 256, sec. 124; 20 R. C. L., p. 353, sec. 15; Davidson v. Ryle, 103 Texas 209, 217, 124 S. W. 616; Waggoner v. Dodson, 96 Texas 415, 420, 421, 73 S. W. 517; Blagge v. Moore, 6 Texas Civ. App., 359, 23 S. W. 466, 472; Harris v. Masterson, 91 Texas 171, 177; Golson v. Fielder, 2 Texas Civ. App., 400, 21 S. W. 172, 174; Texas Co. v. Dunlap, 41 S. W. (2d) 42, 44; Garrett v. Parker, 39 S. W. 147 (writ refused); Green v. Hugo, 81 Texas 452, 457, 17 S. W. 79; Smith v. Estill, 87 Texas 264, 269, 28 S. W. 801; Carter & Bro. v. Davis, 88 S. W. (2d) 596, 601; Yates v. Buffalo State Bank, 229 S. W. 619, 622; Moore v. Scott, 38 S. W. 394; Hexter v. Pratt, 10 S. W. (2d) 692, 694; Spiller v. Bell, 55 S. W. (2d) 634, 636; Hill v. Stampfli, 290 S. W. 522, 525; City of Dallas v. Rutledge, 258 S. W. 534, 539.

The defendants in error not only claim title under the lease as originally acknowledged before Birdwell, but as *reacknowledged by* Turner and wife on October 18, 1930, before James A. Copeland, a notary public in and for Harris County, and which was again filed and recorded. The lease as last recorded was, and is, exactly the same as it was when recorded the first time, except it had been *again acknowledged by the lessors,* Turner and wife, before a qualified notary. That was the only change or addition made.

Since the first acknowledgments were in statutory form, the fact of re-acknowledgment under the circumstances points

unmistakably to the real reason for the re-acknowledgment and re-recordation,—namely, some *latent* defect in the first acknowledgment, and was sufficient to put defendants in error upon inquiry, which, had it been pursued, would have led to knowledge of Birdwell's disqualification to take the Turner acknowledgments, and the consequent invalidity of the Turner lease. 31 Tex. Jur., pp. 362, 365, secs. 4, 5; 46 C. J., pp. 543, 547, secs. 29, 30.

An acknowledgment is a part of an instrument, and facts disclosed by it have the same effect as notice as if they appeared in the body thereof. 36 Tex. Jur., p. 499, sec. 61; Griggs v. Houston Oil Co., 213 S. W. 261; Green v. Hugo, 81 Texas 452, 457, 17 S. W. 79.

No jury finding that Birdwell was disqualified was necessary. His disqualification was apparent from the record, exists as a matter of law; and defendants in error are charged with notice thereof. There was no evidence that there were two G. P. Birdwells in Ruck County, where these transactions took place, and the record shows that G. P. Birdwell had acted as a notary for the Joiner-Tucker interests in the other instance.

In the absence of evidence to the contrary, we must presume that *G. P. Birdwell*, the *notary*, was the same *G. P. Birdwell* who was a beneficiary in the Tucker-Warren assignment. Under the facts before us, "proof of identity or similarity of name will suffice." 30 Tex. Jur., p. 597, sec. 13; 22 C. J., p. 92, sec. 32; Chamberlayne's Hand Book on Evidence, p. 339, sec. 488; 15 Am. & Eng. Ency. of Law ,2d ed.), pp. 918, 920, sec. 8; Stebbins v. Duncan, 108 U. S. 32; 27 L. Ed. 641, 647; Chamblee v. Tarbox, 27 Texas 140, 144; Robertson v. Dubose, 76 Texas 1, 6, 13 S. W. 300; Smith v. Gillum, 80 Texas 120, 125, 15 S. W. 749; Leland v. Eckert, 81 Texas 226, 229, 16 S. W. 897; Lemberg & Allen v. Cabiness, 75 Texas 228, 12 S. W. 844; Jester v. Steiner, 86 Texas 415, 419, 25 S. W. 411; Clark v. Groce, 16 Texas Civ. App. 453, 41 S. W. 668; Blunt v. Houston Oil Co., 146 S. W. 248, 251 (writ refused); Hill & Jahns v. Lofton, 165 S. W. 67, 70 (writ refused); Batcheller v. Besancon, 19 Texas Civ. App. 137, 47 S. W. 296, 299 (writ refused); Lee v. Murphy, 119 Calif. 364, 51 Pac. 549. In the case last cited, the Supreme Court of California held:

"An acknowledgment of a mortgage made before a notary public bearing the same identical name with that of the mortgagee, and made in the county of the residence of both parties,

must be presumed, from the identity of name, to have been taken before the mortgagee as a notary public, in the absence of proof to the contrary; * *"

The lease executed by Mr. and Mrs. Turner to C. M. Joiner, Trustee, being void as to the homestead, conveyed no title; and defendants in error, who claim under and through Joiner, Trustee, being charged with knowledge of its invalidity, cannot recover. 41 Tex. Jur., p. 486, sec. 27.

On July 25, 1930, long before the execution of the conveyance from Joiner, Trustee, through which defendants in error claim title, G. G. Turner and wife executed an oil and gas lease on the property here involved to J. W. Pevey. The lease was properly acknowledged by both lessors on August 2, 1930, filed for record in Rusk County on August 5th, and duly recorded on August 8, 1930. It is through this conveyance that the plaintiff in error, Gulf Production Company, claims.

Against the conclusion that this instrument is valid and effective, defendants in error urge the proposition that in May or June, 1930, prior to the execution of the Pevey lease on August 2, 1930, the Turners had abandoned their homestead, and that by reason thereof the Joiner lease became effective as a conveyance by Turner of the property.

The jury found that Turner and wife, prior to August 2, 1930, "moved away from the land in controversy with no intention of returning and occupying same as their homestead." In view of the law that an abandonment of the homestead is not accomplished by going away without any intention to return at any particular time, but by going away *"with the definite intention never to return at all"*; and in view of the rule that the homestead claimant may leave the homestead because of the illness of himself or family, and for many other reasons or purposes, including that of acquiring means to improve the homestead, or for the subsistence of his family, or he may leave with the intent "to abandon provided he can sell," without an abandonment of his present homestead, it may well be doubted if this finding is sufficient to constitute a legal abandonment of the homestead. 22 Tex. Jur., pp. 71, 72, sec. 46; Foreman v. Meroney, 62 Texas 723, 727; Shepherd v. Cassidy, 20 Tex. Jur., pp. 24, 30; and authorities *post*. Be that as it may, however, there is not a scintilla of evidence in this record to support the jury's finding. On the contrary, *all* the evidence shows that when the Turners left the premises in controversy

in May or June, 1930, they left for a short visit to their daughter in Houston, the immediate occasion being a "stroke" suffered by Mrs. Turner; because of which, and Mr. Turner's feeble condition, they were unable to care for themselves.

No oil had been discovered in Rusk County or the East Texas oil field at that time; and the same situation existed on July 25 and August 2, 1930, when they executed the Pevey lease.

G. G. Turner, the plaintiff in error, testified by depositions (taken apparently in 1931) that he was taken ill upon his place (the land in controversy) in May (1930) ; that he worked some after he was unable to work, but had not been able to work to amount to anything since that time. *He stated that his illness was the occasion for leaving the farm and moving to Houston, because he was not able to work. Referring to the place here involved, the witness testified; That it was his home during all that time; that he was living there in 1927, and that it was still his home.* That now he was just living around with his children. He further said that it was the only home he was going to keep, and that if anything happened to any of his children, or if they ever "got oil out of that country" he was going back; that it was the only home he had.

Mrs. G. G. Turner testified by depositions (taken apparently in 1931) that she lived in Houston with her daughter, Mrs. Love, and her son-in-law; that she lived with them, in Palestine, until they moved to Houston; that she moved from her old home (in Rusk County) in June, 1930; that the property in controversy *"is still our home. It will be until our death I reckon";* that it was the only home they had; that she was now just living with her children; and that she did not intend to sell their home as long as she lived.

John W. Turner, a son of the plaintiffs in error, Mr. and Mrs. Turner, *who assisted Cameron, Joiner's agent, in obtaining a re-acknowledgment of the Turner-Joiner lease,* to be later referred to, was called as a witness by the defendants in error, and testified: That his father and mother went to Houston in May or June, 1930; that they were 77 years of age at the time; that his mother *"suffered a stroke"* just before they went; that his father's health at the time, and the general strength of his parents, *"was feeble";* and that all his brothers and sisters had previously married, and all *"left home,"* except one of the boys who lived on the place, but not in the house with

his father and mother. In answer to the question as to why his father and mother left home and went to Houston, he said: *"It was on account of mother's sickness, she had a stroke and got to where she was not able to wait on herself."* (Italics ours.)

John Talley, testifying upon the trial of the case in March, 1932, stated that he was the son-in-law of Mr. and Mrs. Turner, his wife being their daughter, Eunice (deceased at the time the evidence was being given) ; that in June, 1930, his father-in-law came to Houston, not to live, but to pay a visit; and that he came to stay two weeks. He said: *"To be exact he wrote me a letter and told me that he was coming to spend two weeks with me;* that Mr. and Mrs. Turner came as far as Palestine together from the old place, but Mrs. Turner stopped in Palestine, "because she was not able to make the trip," and Mr. Turner came on to the witness' house at Houston.

The witness' wife died in August (1931), and one of the Turner boys, Emmett, took Mr. Turner back to his (Emmett's) home at Arp; and that Mr. Turner had been at the old place and back to Houston visiting, first one place and then another, among his children.

The witness said: *"My father-in-law and mother-in-law, they got to where they were not able to stay in the old home and look after themselves after Mrs. Turner had her little stroke. * * Mr. Turner did not come to live with me. He came to pay me a visit, and Mrs. Turner's health had been bad and is yet to where we thought it was not safe for them to go back to their home."*

This witness testified that Mr. and Mrs. Turner's home was the old homestead; that they claimed the old home as their homestead; that they still have all of their personal belongings in their old home, including their household furnishings, livestock, and chickens; that they have always called it home and always will; in fact it is their home; and that Mrs. Turner had been back to the old place to visit Dake, a son, who lived there, two or three times since she left it in June, 1930. (All italics ours.)

Emmett Turner, a son of Mr. and Mrs. Turner, testified that his father and mother claimed the land in controversy as their homestead; that they would both love to live at the old home place if they could; that his father has told him that no

telling how many times; that his father had asked him to take him back to the old home several times, and he had carried him back there five or six times in the last six months; that he spends all the way from a week to a month when he goes back; and that he spent two weeks there the preceding January, and a month "up until a few days ago."

It is true that Mr. Turner, testifying (by deposition) in 1931, *after oil wells had been brought in on his place*, stated there were oil wells on the place then, and he did not think he would make it his home any more; that he had no intention of going back there; and that he might go up there, but he could not live there any more. This evidence was given in view of the condition of things at the old home place at the time the witness was testifying, but even then was qualified by the statement, *that if anything happened to his children, or if they got oil out of that country, he would go back.* In connection with this qualifying statement, the testimony shows that after the death of Mrs. Talley, his daughter, (in August, 1931) with whom he was staying in Houston, *he did go back, and has been back many times, staying sometimes as long as a month at the old home place, where his household goods and belongings were.* Mrs. Turner, also testifying (by deposition in 1931), *after the oil wells came in,* said it would be impossible for them to go back to the old home to live; *that Mr. Turner's health was failing faster and faster.* But this in turn is qualified by her further statements that the property here in controversy was the only home they had; that now they were just living with their children; but that they had no other home, and did not intend to sell it as long as they were living.

This testimony of Mr. and Mrs. Turner relates only to the conditions existing, and their own state of mind, approximately a year after they went to Houston, long after the conveyance to Pevey, and does not in the remotest degree refer to the conditions at the time of the execution of the Pevey lease, or their *intentions* when they left their home for the visit to Houston in June, 1930.

In addition to the foregoing testimony, we also note that in the Pevey lease the use of the water wells on the premises was reserved from the grant; that pipe lines were required to be buried below plow depth; that the lessee was prohibited from drilling oil wells nearer than 200 feet of the house or

barns on the premises, without the written consent of the lessors; and that the lessee should pay for damages caused by oil operations to growing crops. These reservations, or provisions, plainly evidenced the intentions of the lessors to continue to occupy and use the premises for the usual farm and residential purposes.

In addition to the above, we direct attention to the fact that the undisputed evidence shows that at all times, from the day they left home in June, 1930, up to the time of the trial in March, 1932, Mr. and Mrs. Turner used the old home in the only way their age and state of health permitted them to use it. They kept all their household goods and effects there, visited the place from time to time, Mr. Turner sometimes staying a month at a time; and we assume they enjoyed the rents and revenues from the home, because nothing appears to the contrary. Under such circumstances, there is no abandonment of the homestead. Foreman v. Meroney, 62 Texas 723, 727; Rawleigh v. Blackwell, 48 S. W. (2d) 754; and authorities *post*.

There is not a line in the record which shows the Turners had any intention of abandoning their homestead from the time they left home, in June, 1930, to the date of the execution of the Pevey lease. *They left because they were ill and feeble, the undisputed evidence showing, for a temporary visit. It is true Mrs. Turner's illness from her "stroke" was prolonged some two or three months before she reached Houston, but every moment of her absence, as well as the absence of Mr. Turner, up until the execution of the Pevey lease, was due to the illness or feebleness of one or the other, or of both. There is nothing in the remotest degree that up to that time they had the intention not to return to the old homestead when they could.*

The defendants in error, in their brief filed in the Court of Civil Appeals, summarized the evidence as to the occasion and reason for Mr. and Mrs. Turner's trip to Houston as follows:

"The facts show that in 1930 Mr. and Mrs. Turner were seventy-seven years old. They were feeble from their advanced years. Mr. Turner was no longer physically able to work. Mrs. Turner's feebleness had brought on a stroke. Their children had married and moved away from the old home and had become scattered. Mrs. Talley, a daughter, had moved to Hous-

ton; Mrs. Love, another daughter, was living in Palestine; John and Emmet, sons, had acquired farms of their own, and Dake, another son, was living in a separate house on the old Turner place."

Defendants in error then say, *arguendo*:

"Feeble and in their advance years, these old people knew that they could no longer live alone on the farm. They would of necessity have to spend their few declining years in the care of their children."

It thus appears that there is a unanimity of conclusion from the evidence that Mr. and Mrs. Turner went to Houston because of illness, and because of their aged and feeble condition—that in no sense did they *voluntarily* leave the old home. The statement in the quotation that "these old people knew that they could no longer live alone on the farm," is purely argument of counsel. There is no evidence of any character as to what "these old people" knew.

The homestead provisions of the Texas Constitution were intended to be interpreted and administered in a practicable way. They were formulated by able men, well acquainted with the ordinary conditions of life, who knew men and their wives become aged, infirm, feeble, and ill, and that, as the end nears, they must be nursed and cared for by their children—or generally were,—and sometimes, as it were, "live around among the children." They also knew that when old age and illness come, the preservation of the homestead, with what shelter and sustenance it offers, is more needed than before. Under the homestead provisions of the Constitution and laws of Texas, aged and sick people do not go at their peril to the homes of their children for aid in their feebleness and distress; these provisions are not so tenuous and frail a shield as that. They were intended to protect the homestead through all the natural vicissitudes of life, including old age, feebleness, and sickness; and during every condition or circumstance that these entail, *unless and until the homestead is voluntarily abandoned.* A temporary absence, due to these or other like causes, or domestic or financial necessities, or the unfitness of the home for use, does not constitute an abandonment; and to this we may add that if Turner and wife left the old home as defendants in error say, because "feeble and in their advanced years these old people knew they could no longer live alone on the

farm" and "would of necessity have to spend their few declining years in care of their children," there was no *voluntary* abandonment of the home. An act of *necessity* is not a *voluntary* act, *and there can be no legal abandonment, unless it is voluntary.* 22 Tex. Jur., p. 75, sec. 49, p. 76, sec. 50; 29 C. J., p. 941, sec. 359, p. 939, sec. 356; Sykes v. Speer, 112 S. W. 422, 426; Rawleigh v. Blackwell, 48 S. W. (2d) 754; Flynn v. Hancock, 35 Texas Civ. App., 395, 80 S. W. 245, 246; Foreman v. Meroney, 62 Texas 723, 727; Shepherd v. Cassidy, 20 Texas 24, 30; Baum v. Williams, 16 Texas Civ. App. 407, 41 S. W. 840; 29 C. J., p. 939, 941, secs. 356 to 359, and many illustrative authorities cited in the notes; Rose v. Farmers, etc. Bank, 148 Pac. 745; authorities *post.*

As said by Chief Justice Hemphill in Shepherd v. Cassidy, just cited:

"We must remember the wise and beneficient purpose of the homestead exemption; that it was intended to secure the peace, repose, independence, and subsistence of citizens and families; that it was placed beyond the reach of creditors, an asylum upon which they might gaze, but which they could neither enter nor disturb; a right so strongly secured, founded upon such high public policy, cannot be lost by the mere absence of the party or family intended to be benefited. The homestead is not to be regarded as a species of prison bounds, which the owner cannot pass over without pains and penalties. *His necessities and circumstances may frequently require him to leave his homestead for a greater or less period of time. He may leave on visits of business or pleasure; for the education of his children; or to acquire in some more favorable location, means to improve his homestead; or for the subsistence of his family; of he may intend to abandon, provided he can sell. But let him leave for what purpose he may, or be his intentions what they may, provided they are not those of total relinquishment or abandonment, his right to the exemption cannot be regarded as forfeited.*" (Italics ours.)

We quite agree with the opinion of the Commission of Appeals in the case of Foreman v. Meroney, 62 Texas 723, 727, in which it is said:

*"The homestead, therefore, is not to be likened to prison bounds, within which the family must always remain, but to a sanctuary, to which they may always return. And an abandonment is accomplished, not by going away without any in-*

*tention of returning at any particular time in the future, but by going away with the definite intention never to return at all."* (Italics ours.)

The authority just quoted states the correct rule. To constitute an abandonment of a homestead, *the claimant must go away with the definite intention not to return; or, we may add, must form such definite intention after going away.* 22 Tex. Jur., pp. 71, 72, sec. 46; Henderson v. Texas M. Plow Co., 109 Texas 466, 470, 211 S. W. 973; Archibald v. Jacobs, 69 Texas 248, 251, 6 S. W. 177; Hudgins v. Thompson, 109 Texas 433, 437, 211 S. W. 586; Dunlop v. English, 230 S. W. 829, 830; Gouhenant v. Cockrell, 20 Texas 96; Shepherd v. Cassidy, 20 Texas 25; Sanders v. Sheran, 66 Texas 655, 2 S. W. 804; McKenzie v. Mayer, 20 S. W. (2d) 238, 240; Gonzales v. Zachry, 84 S. W. (2d) 855, 857 (writ refused); Bogart v. Cowboy State Bank, 182 S. W. 678, 681; Grimes v. Cline, 300 S. W. 235, 236; Armstrong v. Neville, 117 S. W. 1010; Clem Lumber Co. v. Elliott Lumber Co., 254 S. W. 935, 938.

Moreover, the party asserting the abandonment of a homestead has the burden of proving it *"by evidence undeniably clear and beyond almost the shadow—at least all reasonable ground of dispute."* 22 Tex. Jur., p. 72, sec. 46; 22 Tex. Jur., p. 81, sec. 53, p. 82, sec. 54; Gouhenant v. Cockrell, 20 Texas 96, 98; Shepherd v. Cassidy, 20 Texas 24, 29, 70 Am. Dec. 372; Thomas v. Williams, 50 Texas 269, 274; Hudgins v. Thompson, 109 Texas 433, 437, 211 S. W. 586; Bogart v. Cowboy State Bank, 182 S. W. 678, 681; Bell v. Franklin, 230 S. W. 181, 184; Dunlap v. English, 230 S. W. 829.

In the face of these authorities, it is idle to say, under the evidence in this case, that up to the time the Pevey lease was executed it is "undeniably clear, and beyond almost the shadow—at lease all reasonable ground of dispute," that the Turners had abandoned their home. There is no evidence whatever to support the jury's verdict, and it must be disregarded.

We are familiar with the rule invoked by defendants in error (22 Tex. Jur., p. 134, sec. 94), but it has no application here, for the reason that up until the execution of the Pevey lease, under which the Gulf Production Company claims, *the homestead had not been abandoned. Until the abondonment takes place, the husband's deed alone conveys nothing, and cannot be held as a restriction on the right of or as an impediment*

*to the conveyance of the homestead to another in the constitutional and statutory way.* Stallings v. Hullum, 89 Texas 431, 35 S. W. 2.

Under circumstances not necessary to be detailed here, the Turners re-acknowledged the Joiner-Tucker lease of April 7, 1927, under which defendants in error claim, on October 18, 1930. The Pevey lease had been filed for record and was of record long prior to the date of the re-acknowledgment. The defendants in error were therefore charged with notice of the conveyance to Pevey and his vendees, and can assert no title under the re-acknowledgment lease against them. It is only where intervening rights have not attached that the re-acknowledgement of a defective conveyance may be effective. 1 Tex. Jur., pp. 563, 564, sec. 160; King v. Haley, 75 Texas 163, 12 S. W. 1112; Kinnear v. Tolbert, 262 S. W. 900; Leonard v. Benford Lbr. Co., 110 Texas 83, 89, 216 S. W. 382; 13 R. C. L., p. 1323, sec. 360; 1 R. C. L., p. 306, sec. 100; Smith v. Pearce, 85 Ala. 264, 7 Am. St. Rep. 44; Doe v. Howland, 8 Cow. (N. Y.) 277, 18 Am. Dec., p. 445; 1 C. J., p. 874, sec. 238, p. 767, secs. 37, 38; Richardson v. Woodstock, 90 Ala. 266, 9 L. R. A., p. 348; Parks v. Bennett, 104 Ala. 438; Durfee v. Garvey, 65 Calif. 406, 4 Pac. 377; Stevens v. Stevens, 16 John (N. Y.), p. 110; 1 Am. Jur., p. 385, sec. 163; C. J. S., vol. 1, p. 875, sec. 117.

In the absence of findings that the lease of the Turners to Pevey was invalid, and that the plaintiff in error, Gulf Production Company, knew or was charged with notice thereof (and there are no such findings in the record), the re-acknowledgment of the void Turner-Joiner lease conferred no right, title, or estate on Joiner, Trustee, and his vendees.

At the time of the re-acknowledgment the title to the mineral estate here involved was not in the Turners, but in Pevey, or his vendees, and the reacknowledged lease conveyed nothing.

On the whole, for the reasons stated above, we have concluded that the Turners had the right, in law, to convey the mineral estate here involved, notwithstanding the attempted execution of the lease of April 7, 1927, and the events which followed; that they had the right to execute the lease to Pevey, dated July 25, 1930; acknowledged August 2, and recorded August 8, thereafter, under which the Gulf Production Company claims title.

The judgments below against the Turners were erroneous, because the title to the mineral estate sued for was not in the defendants in error, but in the Gulf Production Company. The judgments against the Gulf Production Company were erroneous, because the title of that company was superior to that claimed by the defendants in error.

The judgments of the District Court and of the Court of Civil Appeals, in so far as they authorize a recovery in favor of the defendants in error, and against the plaintiffs in error, G. G. Turner and wife, Sina A. Turner, and Gulf Production Company, will be reversed, and judgment rendered that as against said plaintiffs in error, the defendants in error shall take nothing. In other respects, the judgments of both courts will be affirmed.

MARGINAL NOTES REFERRED TO IN OPINION.

(1)
"STATE OF TEXAS )
"COUNTY OF RUSK ) No. 3719.

"For and in consideration of the sum of One Thousand Dollars, ($1,000.00) to me in hand paid, the receipt of which is hereby duly acknowledged, I, C. M. Joiner, Trustee, have this day and do by these presents sell and assign a one-fourth undivided interest in and to all the oil and gas leases now owned and controlled by me as Trustee in Rusk County, Texas, and all leases and royalties to be secured and taken in my name as Trustee in said county, the amount heretofore secured amounting to five thousand or more acres, the said above leases are unincumbered and it is the intention of this conveyance to assign a one-fourth undivided interest in all the above mentioned leases to W. D. Tucker of Overton, Texas, and for the above consideration, the said W. D. Tucker is to hold a one-fourth undivided interest in and to all the oil and gas leases and royalty taken in name of C. M. Joiner, as Trustee, Also a one-fourth undivided interest in and to all oil and gas wells to be drilled on said property as the entire interest to be retained in any drilling contract that may be made as the amount retained by said Trustee in the promoting of the drilling of same is to the entire amount retained by said Trustee, giving the assignee hereto a one-fourth undivided interest thereto.

"In addition to the above there are a number of the leases in the vicinity of above leases, originally taken in the name of Citizens' Lease Syndicate, which is now controlled by the assignor, it is expressly understood and agreed that the said Assignor and Assignee are to procure new leases on as many of the leases as possible, which are to be held as above set out, giving to the assignee an undivided one-fourth interest in and to all of said leases.

"In getting renewals on the Citizen's Lease Syndicate leases there will be found a few ten acre blocks that are now owned by outside parties, which the records will disclose. These interests, the very small (not more than 200 acres) should be protected, none of them are near where we will put down first test well.

"It is understood and agreed by the parties hereto that seven hundred ($700.00) of the one thousand mentioned in the above consideration is to be deposited in the FIRST STATE BANK OF OVERTON to be used in securing additional leases and royalty to be taken in name of C. M. Joiner, trustee and in recording the ones we now have and getting an ownership map of our hold-

ings, tracings and blue prints covering East Texas Oil fields showing their relation to our property.

"The assignor and assignee each mutually agree to use their best endeavor to increase our holdings and handle them to best advantage, and all expenses thereto to be paid out of the first proceeds derived from sale of any property jointly owned by assignor and assignee.

"It is expressly understood and agreed that in the deposition of any of the property, it must be done with the consent of both parties hereto.

"As soon as our block is completed, the first money received should be used in getting timbers on the ground to build a derrick, as this will greatly help us in getting money to promote a test well.

"It is further expressly understood and agreed that the assignee, W. D. Tucker, is to keep all records, showing a complete list of our holdings, receipts and disbursements.

"IN TESTIMONY WHEREOF I hereunto set my hand this the 29th day of March, A. D. 1927.

(Acknowledgment omitted.)

> "W. D. Tucker, Assignee,
> "C. M. Joiner, Trustee, Assignor.

(2)

"STATE OF TEXAS )
"COUNTY OF RUSK )

"FOR A VALUABLE CONSIDERATION to me in hand paid, the receipt of which is hereby acknowledged, I, W. D. Tucker, hereby assign a one-half interest in and to the attached assignment to Sam Warren, Trustee for

| | | | |
|---|---|---|---|
| "J. H. Silvey | $ 50.00 | V. E. Minor | $100.00 |
| "Sam Warren | 50.00 | G. P. Birdwell | 100.00 |
| "Mrs. W. E. Florey | 50.00 | McDeguerin | 100.00 |
| "Walker Wilson | 500.00 | Lee Gipson | 500.00 |

as their interest appears.

"WITNESS MY HAND this the 30th day of March A. D. 1927.

> "W. D. Tucker."

(Acknowledgment omitted.)