A. R. GRISWOLD et ux., Appellants,

v.

CITIZENS NATIONAL BANK IN
WAXAHACHIE et al.,
Appellees.

No. 3324.

Court of Civil Appeals of Texas.

Waco.

Dec. 29, 1955.

Rehearing Denied Jan. 19, 1956.

C. O. McMillan, Stephenville, L. Hamilton Lowe, Austin, for appellants.

Griffith & Lumpkins, Hancock & Hancock, Waxahachie, for appellees.

TIREY, Justice.

The action is one to set aside and cancel a deed to the homestead of appellants on the ground that the deed was a mortgage. The appellees contended that the deeds were conveyances as distinguished from mortgages and they also set up cross-actions to recover certain indebtedness owed them by appellant A. R. Griswold. The trial court overruled appellants' motion for instructed verdict and submitted two issues to the jury:

1. "Do you find from the evidence that at the time of the execution of the deed from the plaintiffs A. R. Griswold and wife Ruby Griswold, to the defendants Citizens National Bank in Waxahachie and the Waxahachie Bank & Trust Company on March 6, 1953, which is in evidence before you, the parties in said instrument intended by the execution and delivery of same that the said instrument should constitute a mortgage in fact for security of money then owed by the plaintiff A. R. Griswold to the defendant Citizens National Bank in Waxahachie and Waxahachie Bank & Trust Company?", to which the jury answered "No".

2. "Do you find from a preponderance of the evidence that the Notary Public taking the acknowledgment of plaintiff Ruby Griswold to said instrument on March 6, 1953 did not explain to said plaintiff Ruby Griswold the nature and contents of said instrument? Let the form of your answer be, 'She did so explain said instrument' or 'She did not so explain said instrument'", to which the jury answered "She did so explain said instrument."

The court overruled appellants' motion for judgment non obstante veredicto and granted defendants' motion for judgment on the verdict and decreed that the Citizens National Bank and the Waxahachie Bank & Trust Company, appellees herein, do have and recover of appellants the right of possession and the fee simple title in and to Lots 33 and 34 in Block 6 of the Hillcrest Addition to the City of Waxahachie, particularly described in the decree, and further decreed that cross-plaintiff, Citizens National Bank, recover of and from the appellants A. R. Griswold and wife, Ruby Griswold, the sum of $12,281.97, with interest at the rate of six per cent from September 2, 1953 to date of trial and thereafter until paid in full, and further decreed that the Citizens National Bank do have and recover of and from the appellants A. R. Griswold and wife, Ruby Griswold, the sum of $9,066.95, with interest at the rate of six per cent from December 1, 1953 to date of trial and thereafter until paid in full, and fixed attorney's fees and made an award thereon. Appellants seasonably perfected their appeal to this court.

The decree is assailed on seven points. They are substantially: (1 and 2) the error of the court in overruling motion for instructed verdict, and in overruling motion for judgment non obstante veredicto; (3, 4, 5 and 6) that there is no evidence to support the verdict; there is no evidence to support the jury's answer to Issue No. 1; the evidence is insufficient to support the verdict and the judgment entered thereon; and the answer of the jury to Issue No. 1 is contrary to the overwhelming preponderance of the evidence; and (7) the error of the court in refusing to submit to the jury plaintiffs' Special Requested Issue No. 3. Special Issue No. 3 is:

"Do you find from a preponderance of the evidence in this case that the indebtedness of plaintiff A. R. Griswold to the defendant banks to the extent of $9,556.15 was not cancelled on March 6, 1953? Answer: 'It was not canceled on such date', or 'It was canceled on such date.'"

Appellees' counter points are to the effect that there was no error in refusing motion for instructed verdict and motion for judg-

ment non obstante veredicto, because the evidence of appellees, if uncontested, and viewed alone, is adequate to form the basis of the judgment, (2) where there is evidence of equal probative force, which if believed by the jury, will support a judgment for the prevailing party, it will not be disturbed on appeal, and (3) because the evidence is sufficient to support the judgment and such judgment is in accord with the overwhelming preponderance of the evidence, (4) the evidence is sufficient to support the jury's answer to Special Issue No. 1, and such answer is in accord with the overwhelming preponderance of the evidence, and (5) where a requested special issue is covered by other issues submitted to the jury, such issue so requested is properly refused.

It is our view that Issues 1 and 2 submitted in the court's charge are the controlling issues made by the pleadings and tendered by the evidence and that the major question before us is whether the evidence tendered is sufficient to sustain the jury's findings thereon. The testimony and exhibits tendered consist of over 300 pages. Necessarily we cannot state the testimony in any great detail. Mr. and Mrs. Griswold moved to Waxahachie in January 1951 and Mr. Griswold engaged in the automobile business, having the agency for Lincoln and Mercury cars; that shortly thereafter he had occasion to become a customer of the Citizens National Bank and the Waxahachie Bank & Trust Company; that in the transaction of the automobile business he became indebted to both banks in substantial sums of money and was so indebted in the month of March 1953; that he also became indebted to an organization called Universal CIT Corporation, which aided him in the financing of his cars.

In appellants' brief we find this statement: "* * * Plaintiffs submit that they were entitled to an instructed verdict, and that their motion for judgment non obstante veredicto should have been granted and judgment rendered in their favor for 'the right of possession and fee simple title' to the homestead. Plaintiffs

concede that the banks are entitled to their judgment against A. R. Griswold for their debts, plus the amount of the credits they attempted to give thereon for the recited cash consideration in the deed, plus interest. However, they are not entitled to such a judgment against Mrs. Griswold." (Although no point is here assigned to the money judgment entered against Mrs. Griswold, we are of the view that the personal judgment entered against her should be reformed so as to correct this error). See Arts. 4614 and 4623, Vernon's Ann.Civ. Stats., and the cases there collated. See also Noel v. Clark, 25 Tex.Civ.App. 136, 60 S.W. 356 (writ ref.); Red River National Bank v. Ferguson, 109 Tex. 287, 206 S.W. 923. Otherwise, we are not in accord with appellants' views as to their motions.

In appellees' brief we find substantially this summary of the testimony tendered. We have the Griswolds on the one hand and Mr. Rutherford, Mr. McQuatters, Mr. Vinyard, Mr. Chapman and Miss Locke on the other, whose testimony, together with the facts and circumstances surrounding this transaction, tendered to the jury the factual situation to be decided by them. There is hardly a particle of outside evidence that may be looked to as evidence free from bias and prejudice, except what was admitted by the Griswolds themselves, and the letter written by Mr. Griswold on the Hot Wells property, which he so artfully forgot, as testified to by Mrs. Burleson. We have the Griswolds saying in effect that the deed was never a deed, that he was merely attempting to put up his assets to assist him in his business operations; that he never discussed the signing of the deed with his wife until the morning of the execution; that he never discussed it with his lawyers, Mays & Mays; that he was not in financial straits with CIT, and that he did not know of the sale of the property until long after it occurred; that he never received notice of the credit for the house, and that it was done without his knowledge, and that he continued to pay interest on the money regardless of the credit; that his son-in-law did not have a part in obtaining an additional overdraft

in the banks; that the car titles taken from the bank were titles to which the banks already had loans on; that since the Griswolds brought the suit to cancel the deed and remove the cloud from the title to their property, they had the burden to show by clear and convincing evidence that the sale was a mortgage as distinguished from a deed. So, going back to the major question here presented under all the facts and circumstances, did the grantors intend by the execution and delivery of the instrument of March 6, 1953, to sell their home, or did they execute it for the purpose of creating a mortgage thereon?

First of all, it is without dispute that Griswold initiated the negotiations surrounding this entire transaction. When Mr. Vinyard, an officer of the Citizens National Bank, returned to town on March 5th he found a telephone call on his desk from Mr. Griswold, and when he answered the call Mr. Griswold insisted on Mr. Vinyard coming to his office. Griswold testified in part: "Q. Did you tell him you were in trouble and had to have some help? A. No, I just told him I was in trouble, I went as far as I could with my business operations."

Mr. Vinyard (referring to the conversation he had with Griswold on the afternoon of March 5th) said in part:

"* * * his opening remark, as I recall, was that he had blown sky high, and he wanted me to or, he wanted to tell me about it, of course, I didn't have any idea what he meant. I asked him to tell me what he meant and he said that he had gotten out of order with I think he said, Universal CIT * * * He was out of trust with them, they had literally scared him to death, and that he did certain things, and furnished them some money to keep them from doing whatever they intended doing to him and he had talked to his attorneys and they told him that he had wronged his friends to help somebody that hurt him and that his lawyers had told him then that the best thing for him to do was to

do the right thing by his friends, and he was wanting to tell me about it and he proceeded with what he had in mind doing * * * he had talked with his attorneys, Mays and Mays of Fort Worth, and he said that his attorneys had told him that having done the wrong thing that he should dispose of anything and everything that he had that he thought was necessary even if it took all of it to take care of the people that he had wronged to get straight with the world.

"Q. Did he say anything about selling his house or any buildings or anything of that nature? A. Well, I asked him what do you mean, Ray, why are you talking to me about it and he said, 'Well, I want to sell certain things from what I have and I believe, you all at the bank can get more for it than I can, or what I could gather in selling to other people, and that if it's possible I want to work something out. I want to get right, to do the right thing.'

"Q. Mr. Vinyard, at that time did he say anything about wanting to sell to the two banks, the Waxahachie Bank & Trust Co. and the Citizens National Bank his house and the building? A. Yes, sir.

"Q. Did he say anything about the matter being discussed with his wife and did you say anything about the matter being discussed with his wife? A. Well, I was just, in that conversation, whether it came before a certain thing being said or after a certain thing being said I don't remember. I asked him if he had discussed this at home. It was all new to me. And I got the impression that after he had talked to his attorneys, he said that he had discussed it with them, and I said, 'Well, you mean that there is an amount involved to the extent that you have got to, you think you have got to dispose of everything you have?' and he said, 'Well, I believe it's that much.' Then I said, 'Well, I don't

know the people that are involved on the other end of the thing, what they would think, I don't know how they would react to it, everything seems to have happened here in just a few minutes. I think you ought to go home and talk it over and make up your mind before we do anything that is what you want to do, if it takes that much to go that far to get the job done.'

"Q. Mr. Vinyard, did you say anything then with reference to notifying the Waxahachie Bank & Trust Company? A. After he had said that he would go home and discuss it with his wife, and I immediately came back to the bank and called the other bank. * . * *

"Q. Did you advise Mr. Griswold, did you advise him to think it over for the next day or two and overnight? A. I told him that, and that we would talk about it the next morning if he was still in the same frame of mind. * * * The next morning Ray called me and said that he still wanted to further discuss it, and we set a meeting as I recall, between 9:30 and 10:00."

Mr. Vinyard further testified that he contacted their attorney, Mr. Richard Chapman, and Mr. Rutherford and Mr. McQuatters of the other bank, and that they were present at the meeting. With reference to the meeting he said in part:

"A. Well, I believe that I opened the remarks by saying, 'Ray, this meeting is being held at your request, rather than my outlining what you have said to me, I would like for you to repeat yourself what you proposed,' and he spoke up.

"Q. What did he speak up? A. You mean go over the same thing that I repeated?

"Q. What did he say on that morning? A. He said that he had gone home after he had talked to me the evening before or the afternoon rather, he had gone and talked to his wife on what he had in mind, and that they

were in full accord, that she thought it was the thing to do also and that they wanted to get these things that were bothering them out of the way, and in order to do that he proposed to tender these things.

"Q. And that he was willing to sell the home? A. Yes, sir. The home and the building, the Lester Building I believe it's better known. * * *

"Q. Did he say anything else? A. The automobile business, the diamond ring, and when he said the automobile business, of course, that carried with it, and he did say so, all the equipment, whatever it took to do business with.

"Q. All right, now Mr. Vinyard, on that occasion did you all discuss the price of the house? A. Yes, sir. * * *

"Q. What price was agreed upon, or do you recall? A. Well, I recall it in this way, that there was a lien of some $5,500.00 * * * that's arriving at a figure of the total value of the house less the amount of the lien, it seemed to me like it changed to a round figure of $12,500 after giving a thought to the lien itself in round figures $17,500 or $17,000, $18,000."

Notwithstanding the fact that Mr. Griswold testified in part to the effect that it was his intention as well as that of his wife and the bank to create a mortgage on his property and give him time to recoup his losses, yet he did testify with reference to the meeting at the bank on March 6th as follows: "Q. Well, what was this talk about $26,000.00, Ray? A. Well, I tried to sell them the place at $26,000.00." No doubt this testimony on the part of Mr. Griswold greatly influenced the jury in their deliberations because Mr. Griswold had initiated the entire proceedings.

Moreover, the testimony of Mrs. Burleson tended to contradict Mr. Griswold's version of the transaction. Mrs. Burleson testified in part:

"Q. Did you receive a letter from Mr. Ray Griswold, the man who is sitting here, instructing you to pay your rent on the building that you had leased here in Waxahachie to Mr. Abie H. Knoch, whose address is on Water Street in Waxahachie? A. Yes, sir, we did."

That thereafter they paid the rent on the building to Mr. Knoch, and Mr. Griswold did not make any further demand on them. In the letter referred to, it states:

"The building located on Madison Street, Waxahachie, Texas in connection with which you have executed a lease of twelve months duration has been sold to Mr. Abie H. Knoch. Therefore, you are requested to forward your rental check to him at 404 Water Street, Waxahachie, Texas." (Signed) "A. R. Griswold."

Mr. McQuatters, executive officer of the Waxahachie Bank & Trust Company, testified to the effect that Mr. Vinyard opened the discussion with reference to this transaction and said:

"A. Ray said he wanted to turn over everything he owned, his home and his business and all of his assets to the two banks because he owed more than he could pay and he wanted to do the right thing about it.

"Q. Now, was there any discussion about it among any of you in your presence or hearing with reference to the selling of this home to the two banks for the purpose of liquidating his debt? A. Yes. He said that he wanted to sell his home to the two banks.

"Q. Was there any discussion as to the price that was to be made him for the sale of the home? A. Yes.

"Q. And his building? A. Yes. The question of price came up; it was discussed there at the meeting.

"Q. Did you have any opinion at that time with reference to the value or market price of the property? A. Well, I felt like $16,000 would be about the fair price * * *

"Q. Were there any other additional prices mentioned or discussed with reference to the sale of this property at the bank there that morning other than your statement, Mr. McQuatters, if you recall? A. Well, I think Bob Vinyard agreed that $16,000 would be a fair price.

"Q. Was there any discussion on the part of Mr. Griswold with reference to his ideas of the market value, the cash market value of the property at that time, what he thought it was worth? A. I believe Ray said that he had more than that in the house but that if it was agreeable with the bank it would be agreeable to him.

"Q. Was the price of $16,000 agreed upon between the banks and Ray Griswold at the time, that is the price he would receive less the debt of his notes? A. That's correct.

"Q. Was that agreed upon at that time at that conference? A. It was. * * *

"Q. Now, then, after you agreed on the price you were to pay on the purchase of this residence was there any discussion had in your presence at this time with reference to the building hereinbefore referred to as the Hot Wells Building, the price you paid for that? A. Well, it was agreed that he was going to turn in whatever real estate he had and also his business and his shop equipment, it was all discussed. I wasn't working out the details on that, on the Hot Wells Building. The only discussion I had was about the residence. * *

"Q. Did you have any discussion or was there any discussion in your presence and hearing by any members of the two banks with reference to Ray Griswold remaining on the property that you had agreed to buy from him for $16,000, less the debt that was on it? A. Yes. That matter came up for discussion.

"Q. Who said what with reference to the subject matter, Mr. McQuatters, as you recall. A. Well, I don't know exactly who made the statement, but after a round of discussion, I believe, it seems like to me that Robert Vinyard, maybe, suggested that he rent the place for about the amount of the payment that he was paying on the house.

"Q. Did you express, if you recall, any opinion as to what a reasonable rent would be for this premises there at that time in the presence of Mr. Ray Griswold? A. I said, the house would rent for at least $75.00, but to be fair about it, we didn't want to make any profit on it, just let Ray rent the house for the amount of $50.53, I believe it was.

"Q. Was there any agreement entered into by you or by Mr. Rutherford as representative of the Waxacachie Bank & Trust Company and the other representatives of the Citizens National Bank and Ray Griswold with reference to him having the privilege of redeeming these premises by repaying the bank their debt and the interests? A. No, sir. At the time he didn't want to redeem it. No, sir, that wasn't discussed. * * *

"Q. Was there any statement made in your presence or hearing by Mr. Vinyard at that meeting while Mr. Griswold was there to the effect that we don't want to buy your home, we want you to have an equity in it. Did you hear anything to that effect at that conference? A. I did not.

"Q. Were the mechanics of the business operations settled upon or in any way disposed of at that meeting or did that happen later? A. That happened after.

"Q. Did you have any conversation with Mr. Chapman with reference to this deed conveying the title of the residence to the two banks and with reference to the filing of it and the publishing of it? A. Well, Dick talked to me about the matter, and we discussed the matter about putting on there, 'Do not publish,' and he asked what I thought about it, and I said, 'Well, I think it would be protection to Ray to not let the public know that he is completely broke in his automobile business, it might help him some.' * * *

"Q. Mr. McQuatters, if you recall from memory or from your notes or from your records which I am going to hand you of your bank, what sum or sums of money did Mr. Griswold owe your bank, the Waxahachie Bank & Trust Company, on the 6th day of March, 1953? A. It looks like on that date he owed our bank $15,908. on automobile financing. * * *

"Q. Now, then, I ask you to examine this. What was the status of Mr. Ray Griswold's bank account on March 6, 1953 with the bank? A. He was overdrawn $19,481.76."

Hon. R. F. Chapman, attorney for the bank, testified to the effect that he prepared two deeds on March 6, 1953 for A. R. Griswold and wife to the Citizens National Bank and Waxahachie Bank & Trust Company; that he was present on the morning of March 6th in the directors' room at the Citizens National Bank at the time the meeting was had with Mr. Griswold as heretofore stated; that the sale of the house and the price were discussed for some fifteen minutes and that the officers of the bank present and Mr. Griswold finally agreed upon a price of $16,000 for the homestead and that he made such notation of his scratch pad to place in the deed; that Mr. Griswold stated that he had put $12,500 into the house and that he had also put in an air conditioner to the amount of $3,500 and that he had put in other improvements in the house for about $8,000, which brought the total up to approximately $24,000; that he made notation as to these figures and that Mr. Griswold said of February 1, 1953 he owed the Federal Savings & Loan Association $5,691.85;

that he owed $752.85 on the air conditioner; that it was the opinion of Mr. McQuatters that the house would sell for about $16,000, "so I put that figure down on this little slip, $16,000, less the debt $6,443.85, which left cash consideration of $9556.15.

"Q. Now, what time, if you recall, did this meeting occur? A. Oh, that was close to 11:00. The reason I was putting these figures down was in order to be able to write the deed when we agreed to a purchase price.

"Q. Now, Mr. Chapman, you had to have that part of the information necessary to draw the deed, is that correct? A. That's right.

"Q. The purchase price? A. That's right. The essential part.

"Q. In other words, the deed said for consideration of the sum of blank dollars, does it not? A. Yes.

"Q. And it has that filled in now, as $16,000? A. $16,000.

"Q. Now, Mr. Chapman, did you go up to your office and prepare a deed? A. Yes. We left, and Mr. Griswold said, 'I will just go up to the office with you and we'll fix these. deeds.' So, we went up there, my secretary, I had her to, that morning, get the description from the Federal Savings & Loan office in the courthouse here from the records and to have the deeds written as far as possible, but just to hold them there until the banks worked out a deal by the house. Then we would come up and put the consideration in and that was the purpose of making these little notations, to see what the considerations would be. * * *

"Q. Now, Mr. Chapman, did you leave that meeting with Mr. Griswold, when you left you did go to your office, did you give them the deeds in your office after it was completed. A. Well, as he was standing there and I said, 'Well, Mr. Griswold I will just sit down and write that consideration in. I wrote it myself, I just sat

down and wrote it out on what we agreed to. He and I did as it is written in the deed here and I showed it to him, and I think he signed the deed right there.

"Q. Mr. Chapman, from the time you began that meeting that morning with the members of the bank and Mr. Griswold and Mr. Vinyard, did Mr. Griswold leave and stay gone and then come back, or was he with you continuously until he left with Miss Locke to get his wife's signature? A. I don't remember him leaving the room myself, I just don't remember though."

Miss Myrtle Locke testified to the effect that she was legal secretary to Mr. Chapman, and that Mr. Griswold, on March 6th, took her in his car and that she took the deeds with her to the Griswold home where she was introduced to Mrs. Griswold and Mrs. Griswold executed and acknowledged the deed; that at the time Mr. Griswold took her out to his home; that as far as she knew no one was there except Mr. and Mrs. Griswold and herself. She testified in part:

"A. We were in the living room, and there was a little table just to the right of the door where we went in. * * *

"Q. Now, Mrs. Griswold, was she seated or was she standing? A. She was standing, I believe * * *

"Q. Well, did you tell Mr. Griswold anything? Did you ask him to leave the room? A. Well, after she signed, I told him he would have to leave the room while I took her acknowledgment.

"Q. Did he leave the room? A. Yes, sir.

"Q. What did you tell Mrs. Griswold in taking the acknowledgment? A. Well, I took the deeds one at a time, showed her the consideration, what the consideration was and told her what property each one covered, and then asked her if she understood it and if she agreed with the considera-

tions therein expressed, and I asked her if she did it willingly, and whether or not she wanted to retract it.

"Q. And what was her reply. A. And she said she did not wish to retract it."

Mrs. Griswold testified to the effect that she was the wife of A. R. Griswold, and with reference to the deed to her home she said:

"Q. Now, what was the purpose of the instrument as you understood it. A. Putting our home up. * * *

"Q. What had been told to you, or I will put it this way, who had talked with you about your signing the paper before you signed it? A. Ray.

"Q. That is your husband? A. Yes.

"Q. Was he the only one that had talked with you about it? A. Yes, sir.

"Q. Now, did you have any understanding from him as to what the purpose of it was? A. Yes, sir.

"Q. What was that? * * * A. They said, it would put our home, they would stay with us in the business until we paid them back, but they didn't, as soon as they sold our cars they quit. * * * They promised to stay with us if we would put our home up, and which we did, if they would stay with us, in business, but instead, they took all of the cars and sold them, and they just took out."

With reference to Miss Locke taking the acknowledgment she said:

"Q. At the time you signed the papers did she say anything to you about what you were signing? A. She talked very nice, she said, 'Mrs. Griswold, I have got some papers here for you to sign, I guess you know what they are,' and I said, 'Yes, I do.' * * *

"Q. Did she say anything else to you about what the papers were that you were signing? A. No, she didn't."

That when Miss Locke came to the house she stayed about five minutes; that her husband had called her from the bank before they came and no member of the bank had ever talked to her about the papers; that the only person she talked to or discussed this with was her husband on that particular day; that she could not remember whether she signed two or three papers; that she read with glasses and that she had no difficulty in reading instruments, but that she didn't read these; that she could read and write the English language and that she was over 21 years of age. "Q. Now, Mrs. Griswold, this deed was signed on March 6, 1953. Ray had discussed this proposition with you two or three days prior to that, had he not? A. I just don't remember * * * I think so."

■■■ Since the deed to the homestead was absolute in form under the parol testimony here tendered, what rule of law is applicable and controlling to the factual situation here presented? We think this question is answered in McMurry v. Mercer, Tex.Civ.App.1934, 73 S.W.2d 1087, point 4, page 1090, writ ref., " 'If there is no indebtedness, the conveyance cannot be a mortgage. If there is a debt existing, and the conveyance was intended to secure its payment, equity will regard and treat the absolute deed as a mortgage. *The presumption, of course, arises that the instrument is what it purports on its face to be, an absolute conveyance of the land. To overcome this presumption and to establish its character as a mortgage, the cases all agree that the evidence must be clear, unequivocal and convincing, for otherwise the natural presumption will prevail.'* * * * 'But although parol evidence is received in such cases to show the real nature of the transaction, the presumption is that the instrument is what it purports to be; and before a deed absolute in form can be shown to be a mortgage, the proof should be clear and convincing. As the rule has often been stated, "to convert a deed absolute into a mortgage, the evidence should be so clear as to leave no substantial doubt that the real intention

of the parties was to execute a mortgage." ' " (Citing cases.) Our Supreme Court has not seen fit to change the rule here stated. See also Bradshaw v. McDonald, 147 Tex. 455, 216 S.W.2d 972.

In determining whether appellants' motions should have been granted, as well as determining whether the evidence tendered is sufficient to sustain the answers of the jury to Issues 1 and 2, we are bound by the following rule of law: "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.' " (Citing cases.) Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, points 8 and 9, page 514, writ ref., opinion by Chief Justice Rice. Under the foregoing rule, did appellants carry their burden? It is our view that they did not. First of all, the evidence of Mr. and Mrs. Griswold in its entirety is not harmonious and consistent with their contention that the instrument conveying their homestead was a mortgage and not a deed. On the contrary, the evidence tendered by appellees is harmonious and consistent with the finding of the jury to the effect that the Griswolds intended, by the execution and delivery of the instrument, to convey their homestead by deed and that the instrument was not a mortgage. Moreover, all the facts and circumstances surrounding the negotiations that lead up to the execution and delivery of the deed by the Griswolds to the banks, did not permit of but one conclusion to the effect that the instrument was a mortgage and not a deed. Going back to the testimony tendered, since it is without dispute that Griswold initiated these negotiations for the execution of the deed to his homestead, and since much evidence was tendered showing that he was acting under great pressure to correct some wrongs that he had committed against those who had befriended him, and since all of the evidence is to the effect that the Griswolds were acting freely and of their own initiative and without any pressure whatsoever being exerted upon them by the banks, and since the bank officials testified to the effect that they had advised Griswold to talk this transaction over with Mrs. Griswold before doing anything, and that Griswold advised them that he had done so, and since Mrs. Griswold testified in part: "Q. Now, Mrs. Griswold, this deed was signed on March 6, 1953. Ray had discussed this proposition with you two or three days prior to that, had he not? A. I just don't remember * * * I think so," and since Mrs. Griswold advised the Notary taking her acknowledgment that she was familiar with the transaction and that she executed the deeds willingly and did not wish to retract her action in so doing, we think such testimony, together with all the facts and circumstances surrounding this transaction, tendered an issue of fact for the jury under the rule stated in Olds v. Traylor, supra, and that such evidence is sufficient to sustain the verdict of the jury. The rule is well settled that if there is any evidence of probative nature to support the verdict of the jury, the appellate court cannot set it aside. See Gulf Production Co. v. Continental Oil Co., 139 Tex. 183, 164 S.W.2d 488, point 14, page 495. See also Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972, 977; Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286. See also cases collated under 4 Tex.Dig. Appeal and Error, ☞1010(1). Believing that the evidence is sufficient to sustain each of the findings of the jury to Issues 1 and 2, and finding no reversible error herein, each of appellants' points is overruled. See Perry v. Long, Tex.Civ.App., 222 S.W.2d 460, points 3 and 4, pages 464, 465 (writ ref.). See also Young v. Blain, Tex.Com.App., 245 S.W. 65, opinion approved on points discussed; Flynn v. Citizens' National

Bank, Tex.Civ.App., 31 S.W.2d 485, points 1–3, page 487 (writ ref.). See also Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, points 5–6.

As we have previously indicated, it is our view that the personal judgment for debt entered against Mrs. Griswold should be eliminated and to that extent the judgment should be and accordingly it is so reformed. Accordingly, the judgment is reformed in part and in all other respects it is affirmed, and all costs taxed against appellants.

Reformed and affirmed.

McDONALD, C. J., and HALE, J., concur.